**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 15-2122

_____

DELAWARE RIVERKEEPER NETWORK;
MAYA VAN ROSSUM, the Delaware Riverkeeper,

Petitioners

v.

SECRETARY PENNSYLVANIA DEPARTMENT OF
ENVIRONMENTAL PROTECTION; PENNSYLVANIA
DEPARTMENT OF ENVIRONMENTAL PROTECTION,

Respondents

TRANSCONTINENTAL GAS PIPE LINE CORP,

Intervenor Respondent

_____

No. 15-2158
_____

NEW JERSEY CONSERVATION FOUNDATION;
STONY BROOK MILLSTONE WATERSHED
ASSOCIATION; FRIENDS OF PRINCETON
OPEN SPACE,

Petitioners

v.

NEW JERSEY DEPARTMENT OF ENVIRONMENTAL
PROTECTION; TRANSCONTINENTAL GAS
PIPE LINE CORP,

Respondents


On Petition for Review of an Order of the
Federal Energy Regulatory Commission
(Agency Nos. FERC CP13-551-00; EA40-013 & EA45-002)
(Agency Nos. 0000-13-0012.1FHA140001,
0000-13-0012.1FWW140001, 0000-13-0012.2FHA140001
& 0000-13-0012.2FWW140001)

Argued on October 29, 2015
Before: GREENAWAY, JR., SCIRICA
and ROTH, Circuit Judges
(Opinion filed: August 8, 2016)

Aaron J. Stemplewicz, Esquire     **(Argued)**
Delaware Riverkeeper Network
925 Canal Street
Suite 3701
Bristol, PA 19007

         Counsel for Petitioners Delaware
         Riverkeeper Network and
         Maya Van Rossum

Katherine V. Dresdner, Esquire
299 Pennington-Titusville Road
Pennington, NJ 08534

Aaron Kleinbaum, Esquire
Eastern Environmental Law Center
744 Broad Street
Suite 1525
Newark, NJ 07102

Susan J. Kraham, Esquire
Edward Lloyd, Esquire     **(Argued)**
Columbia University School of Law
435 West 116th Street
New York, NY 10027

         Counsel for Petitioners New Jersey
         Conservation Foundation
         Stony Brook Millstone Watershed
         Association and Friends of
         Princeton Open Space

Joseph S. Cigan, III, Esquire          **(Argued)**
Commonwealth of Pennsylvania
Department of Environmental Protection
2 Public Square
Wilkes-Barre, PA 18701

Kimberly Hummel Childe, Esquire
Office of Attorney General of Pennsylvania
Department of Environmental Resources
P.O. Box 8464
Harrisburg, PA 17105

Margaret O. Murphy, Esquire
Pennsylvania Department of Environmental Protection
400 Market Street
P.O. Box 8469
Harrisburg, PA 17105

Curtis C. Sullivan, Esquire
Department of Environmental Protection
909 Elmerton Avenue
Harrisburg, PA 17110

        Counsel for Respondents Secretary
        Pennsylvania Department of
        Environmental Protection and
        Pennsylvania Department of
        Environmental Protection

Pamela S. Goodwin, Esquire
Patrick F. Nugent, Esquire

John F. Stoviak, Esquire          **(Argued)**
Saul Ewing
1500 Market Street
Centre Square West, 38h Floor
Philadelphia, PA 19102

Elizabeth U. Witmer, Esquire
Saul Ewing
1200 Liberty Ridge Drive
Suite 200
Wayne, PA 19087

       Counsel for Intervenor Respondent
       Transcontinental Gas Pipe Line Corp


Mark A. Collier, Esquire
John E. Doyle, Esquire
Timothy P. Malone, Esquire
Lewin J. Weyl, Esquire          **(Argued)**
Office of the Attorney General of New Jersey
Department of Law & Public Safety
Richard J. Hughes Justice Complex
25 Market Street
P.O. Box 093
Trenton, NJ 08625

       Counsel for Respondent New Jersey
       Department of Environmental Protection


Michael K. Rutter, Esquire
Heather N. Oehlmann, Esquire

Christine A. Roy, Esquire          **(Argued)**
Richard G. Scott, Esquire
Watson, Stevens, Rutter & Roy
3 Paragon Way
Suite 300
Freehold, NJ 07728

       Counsel for Respondent
       Transcontinental Gas Pipe Line Corp

_____

O P I N I O N
_____

**ROTH**, Circuit Judge:

In this appeal, we are called upon to review water quality-related permitting actions by New Jersey and Pennsylvania for a project by Transcontinental Gas Pipe Line Company, LLC (Transco), which operates the Transcontinental pipeline, a 10,000-mile pipeline that extends from South Texas to New York City. Transco sought federal approval to expand a portion of the pipeline, called the Leidy Line, which connects gas wells in Central Pennsylvania with the main pipeline. Pursuant to the Clean Water Act, the Pennsylvania and New Jersey Departments of Environmental Protection (PADEP and NJDEP, respectively) reviewed Transco's proposal for potential water quality impacts and issued permits for construction. The New Jersey Conservation Foundation, Stony Brook-Millstone Watershed Association, and Friends of Princeton Open Space

(collectively, the Foundation) petitioned this Court for review of NJDEP's decision to issue these permits. In a separate petition to this Court, the Delaware Riverkeeper Network and Maya van Rossum (collectively, the Riverkeeper) challenged PADEP's issuance of a Water Quality Certification required under Section 401 of the Clean Water Act. The petitions were consolidated for review.

For the reasons that follow, we conclude this Court has jurisdiction to hear these petitions, and NJDEP and PADEP did not act arbitrarily or capriciously in issuing the permits. Therefore, we will deny the petitions.

## I.        Statutory Background

Under the Natural Gas Act of 1938,[1] the Federal Energy Regulatory Commission (FERC) has exclusive authority to regulate sales and transportation of natural gas in interstate commerce. Section 7 of the Natural Gas Act grants FERC the power to authorize the construction and operation of interstate transportation facilities.[2] Specifically, no company or person may construct or extend any facilities for the transportation in interstate commerce of natural gas without obtaining a "certificate of public convenience and necessity" from FERC.[3] FERC determines whether a project serves "public convenience and necessity" by reviewing a number of factors, such as the project's impact on competition for the transportation of natural gas, the possibility of overbuilding or subsidization by existing

---

[1] 15 U.S.C. §§ 717-717z.
[2] *Id*. § 717f.
[3] *Id.*

7

customers, avoidance of unnecessary disruptions to the environment, the applicant's responsibility for unsubscribed capacity, and the avoidance of unnecessary exercise of eminent domain.[4] The issuance of a "certificate of public convenience and necessity" is conditioned on receipt of state and other federal authorizations required for the proposed project.[5]

Other federal authorizations may be required because interstate sales and transmission of natural gas are further regulated through federal environmental laws, including the National Environmental Policy Act (NEPA)[6] and the Clean Water Act.[7] To comply with NEPA, before issuing a certificate of public convenience or necessity, FERC must examine the potential environmental impact of a proposed pipeline project and issue an Environmental Assessment or, if necessary, an Environmental Impact Statement.[8]

---

[4] *Transcontinental Gas Pipeline Co., LLC*, 149 FERC ¶ 61,258, 62,676 (2014); *see* Certification of New Interstate Natural Gas Pipeline Facilities, 88 FERC ¶ 61,227 (1999); 90 FERC ¶ 61,128 and 92 FERC ¶ 61,094 (2000) (clarifying policy).

[5] *See Islander East Pipeline Co., Algonquin Gas Transmission Co.,* 102 FERC ¶ 61,054 (2003) ("The Commission routinely issues certificates for natural gas pipeline projects subject to the federal permitting requirements of the . . . [Clean Water Act].").

[6] 42 U.S.C. §§ 4321-4370h.

[7] 33 U.S.C. §§ 1251-1388.

[8] 42 U.S.C. § 4332; *see* 15 U.S.C. §§ 717b-1(a), 717n(b)(1); 40 C.F.R. §§ 1501.1-.8 (implementing NEPA regulations); 18

Although the Natural Gas Act preempts state environmental regulation of interstate natural gas facilities, the Natural Gas Act allows states to participate in environmental regulation of these facilities under three federal statutes: the Clean Air Act, the Coastal Zone Management Act, and the Clean Water Act.[9] As relevant here, the Clean Water Act regulates through a combination of state and federal mechanisms: the U.S. Environmental Protection Agency (EPA) limits the discharge of pollutants into water bodies,[10] and states establish water quality standards, subject to EPA approval, that must at a minimum comply with EPA's limits.[11]

This combination of state and federal mechanisms is apparent when a proposed activity involves discharge of dredged or fill material into the navigable waters of the United States and thus triggers the permitting requirements of Section 404 of the Clean Water Act.[12] Section 404 permits typically are issued by the U.S. Army Corps of Engineers; however, a state may assume the authority to administer these permits. Whether or not the state assumes this authority, a Section 404 permit may be issued only if the state where the discharge will occur issues a Water Quality Certification, governed by Section 401 of the Clean Water Act.[13] A Water

---

C.F.R. §§ 380.1-.16 (implementing NEPA regulations for FERC actions).

[9] 15 U.S.C. § 717b(d).

[10] *See* 33 U.S.C. § 1311.

[11] *See id*. § 1313.

[12] *Id*. § 1344.

[13] *Id*. § 1341.

Quality Certification confirms that a given facility will comply with federal discharge limitations and state water quality standards.[14] Unlike the Section 404 permit, the Water Quality Certification is by default a state permit, and the issuance and review of a Water Quality Certification is typically left to the states.[15]

New Jersey has assumed authority to issue Section 404 permits and delegated administration of the permitting program to NJDEP, which exercises this authority pursuant to the New Jersey Freshwater Wetlands Protection Act.[16] Therefore, for activities that result in discharge of dredged or fill material into New Jersey waters, NJDEP reviews applications for Water Quality Certifications and Section 404 permits. In contrast, Pennsylvania has not assumed Section 404 permitting authority. For activities affecting Pennsylvania waters, Section 404 permits are issued by the U.S. Army Corps of Engineers, and Water Quality Certifications are issued by PADEP.

## II.     Administrative Background

---

[14] *Id*. § 1341(a)(1), (d).

[15] *See, e.g.*, *Lake Erie All. for Prot. of Coastal Corridor v. U.S. Army Corps of Eng'rs*, 526 F. Supp. 1063, 1074 (W.D. Pa. 1981) *aff'd*, 707 F.2d 1392 (3d Cir. 1983); *Roosevelt Campobello Int'l Park Comm'n v. U.S. EPA*, 684 F.2d 1041, 1056 (1st Cir. 1982).

[16] N.J. Stat. Ann. § 13:9B-1-30; 33 N.J. Reg. 3045(a); N.J. Admin. Code § 7:7A-2.1(c); Memorandum of Agreement between the New Jersey Department of Environmental Protection and Energy and the United States Environmental Protection Agency (1993).

In September 2013, Transco submitted an application to FERC for a certificate of public convenience and necessity for the Leidy Southeast Expansion Project. The Project consists of two major types of improvements to existing natural gas pipelines: the construction of four new pipeline "loops" and the upgrade of turbines at four compressor stations. "Loops" are sections of pipe connected to the main pipeline system that reduce the loss of gas pressure and increase the flow efficiency of the system. Compressor stations serve a similar function, using gas- and electric-powered turbines to increase the pressure and rate of flow at given points along the pipeline's route. In its application, Transco proposed installing, within or parallel to existing Transco pipelines, approximately thirty miles of loops. The Skillman Loop and the Pleasant Run Loop, totaling 13.23 miles, would be located in New Jersey; the Franklin Loop and Dorrance Loop, totaling 16.74 miles, would be located in Pennsylvania.

FERC completed the requisite Environmental Assessment in August 2014, and issued the certificate of public convenience and necessity on December 18, 2014. The certificate was conditioned on, *inter alia*, Transco's receipt of "all applicable authorizations under federal law"[17] enumerated in the Environmental Assessment, some of which were to be obtained from New Jersey and some from Pennsylvania.

**A.     New Jersey**

---

[17] *Transcontinental Gas Pipe Line Co., LLC*, 149 FERC ¶ 61,258, 62,687 (2014).

FERC required Transco to obtain the following authorizations for each loop from NJDEP: a Freshwater Wetlands Individual Permit, a Flood Hazard Area Individual Permit, a Water Quality Certification, and a Letter of Interpretation. Transco first obtained Letters of Interpretation, in which NJDEP sets forth the boundaries of freshwater wetlands and state-regulated transition areas.[18] Transco then applied for the remaining permits. In December 2014, NJDEP deemed those applications "administratively complete," a status that triggered a public notice and comment process. Two months later, NJDEP held a public hearing in Princeton, New Jersey. In light of comments from NJDEP staff and the public, Transco submitted revised plans. A few days later, NJDEP asked Transco to address additional comments, and Transco provided responses.

In April, NJDEP issued, for each loop, a Freshwater Wetlands Individual Permit, a Flood Hazard Area Individual Permit, and a Water Quality Certification. In addition, NJDEP released Staff Summary Reports, which set forth the findings and analysis underlying its permitting decisions. Transco began construction on May 6, 2015. Two days later, the Foundation petitioned this Court for review of NJDEP's decision to issue the permits.

Later in May, while the Foundation's petition was pending, Transco submitted a request to NJDEP for a minor modification to the Freshwater Wetlands Individual Permit for the Skillman Loop, to change the excavation method for a wetland in Princeton, New Jersey. NJDEP approved the request on June 4, 2015, which the Foundation challenged in

---

[18] N.J. Admin. Code § 7:7A-3.1 (2008).

its opening brief. Later in June, the Foundation filed an emergency motion for a stay of construction. A week later, we denied the motion. At this time, the New Jersey portion of the project is substantially complete.[19]

### B. Pennsylvania

FERC required Transco to obtain from PADEP a Water Quality Certification and a Water Obstruction and Encroachment Permit. The latter, issued under Chapter 105 of PADEP's regulations, are referred to as "Chapter 105 Permits." FERC further required Transco to obtain a Section 404 permit from the U.S. Army Corps of Engineers. Each certificate or permit covered both loops in Pennsylvania.

Transco applied to PADEP for the Water Quality Certification in June 2014. In the following month, PADEP published notice in the Pennsylvania Bulletin that it intended to issue a Water Quality Certification so long as Transco obtained certain other state permits, including a Chapter 105 Permit. In April 2015, PADEP issued a Water Quality Certification for the project. Shortly thereafter, the Riverkeeper filed a petition in this Court specifically challenging the Water Quality Certification. Three months later, PADEP issued a Chapter 105 permit. After receiving all of its required permits, Transco sought permission from FERC to proceed with construction. FERC granted this

---

[19] Transco submitted the Declaration of John B. Todd, who serves as project manager; Todd indicated that construction along both Skillman and Pleasant Run Loops is between 93 to 100% complete in regulated and non-regulated areas.

request in July 2015, during the pendency of the instant matter.

## III.     Threshold Challenges

At the outset, we consider challenges by NJDEP and PADEP regarding this Court's jurisdiction, the justiciability of the petitions, and whether sovereign immunity shields state agency actions. Specifically, NJDEP and PADEP allege that we lack subject matter jurisdiction to review the petitions and that, even if we had jurisdiction, the petitions are barred by the Eleventh Amendment. NJDEP further argues that because construction in New Jersey is substantially complete, the petition is moot.

### A.     Subject Matter Jurisdiction

The Riverkeeper and the Foundation, in petitioning this Court for review, invoke a provision of the Natural Gas Act that confers original jurisdiction on Courts of Appeals over certain state and federal permitting actions for interstate natural gas pipelines. Both PADEP and NJDEP contest whether that provision applies. Our jurisdiction ultimately depends on whether PADEP and NJDEP acted "pursuant to Federal law" in issuing permits to Transco.

We begin with the statute. In 2005, Congress amended the Natural Gas Act to subject certain state and federal permitting decisions for interstate natural gas pipeline projects to review by the federal Courts of Appeals.[20]

---

[20] Energy Policy Act of 2005, Pub. L. No. 109-58, Sec. 313, 119 Stat. 594, 689-90.

14

Specifically, under Section 19(d) of the Natural Gas Act, the Courts of Appeals have jurisdiction to review actions undertaken (1) by a State administrative agency; (2) pursuant to federal law; (3) to issue, condition, or deny a permit, license, concurrence, or approval; (4) required for an interstate natural gas facility permitted under the Natural Gas Act; (5) that is located in the jurisdiction of the circuit Court of review.[21] The parties do not dispute that all elements are met except whether NJDEP and PADEP acted "pursuant to Federal law" in issuing Water Quality Certifications, permits, and Letters of Interpretation.

NJDEP and PADEP contend that their decisions to issue Water Quality Certifications are not covered by the provision that grants jurisdiction to this Court and, consequently, we lack jurisdiction to hear these petitions. NJDEP further contests our jurisdiction to review those authorizations that "exclusively involv[e] issues of State law," including the Flood Hazard Area Individual Permits, the Letters of Interpretation, and those portions of the Freshwater Wetlands Individual Permits that address state-regulated issues such as transition areas or state threatened and endangered species. For the following reasons, we hold that we have jurisdiction over these petitions.

### B. Jurisdiction over Water Quality Certifications

#### 1. Permits Issued by PADEP

---

[21] 15 U.S.C. § 717r(d)(1) (2005). This amended section is also referred to as "Section 19(d)" based on where it appears in the Natural Gas Act.

PADEP argues that this Court does not have jurisdiction over Water Quality Certifications because our jurisdiction under the Natural Gas Act extends only to state agency action taken *pursuant* to federal law, whereas a Water Quality Certification is *required by* federal law. This argument does not pass muster. Although the Clean Water Act makes clear that states have the right to promulgate water quality standards as they see fit, subject to EPA oversight, the issuance of a Water Quality Certification is not purely a matter of state law.[22] A state issues a Water Quality Certification for an interstate natural gas facility to certify compliance with state water quality standards, promulgated under federal supervision, as well as with federally-established Clean Water Act requirements.[23] Specifically, a Water Quality Certification confirms compliance with Sections 301, 306, and 307 of the Clean Water Act, all of which involve federal standards.[24] Thus, a Water Quality Certification is not merely required by federal law: it cannot *exist* without federal law, and is an integral element in the regulatory scheme established by the Clean Water Act. To say otherwise would be to ignore the EPA's supervisory role in the setting of state water quality standards, the fact that Water Quality Certifications must verify compliance with federal standards, and the role of the federal government in regulating water quality as envisioned by drafters of the Clean Water Act.[25]

---

[22] *See* 33 U.S.C. § 1251(b).

[23] *Id.* § 1341(a)(1).

[24] *Id.* §§ 1311, 1316, & 1317.

[25] *See id.* § 1251(a) (presenting the Clean Water Act's goals as a matter of "national policy").

16

The conclusion that a Water Quality Certification is issued pursuant to federal law is bolstered by the Natural Gas Act's provisions that allow states to regulate or subject state action to federal judicial review. The Natural Gas Act preempts state environmental regulation of interstate natural gas facilities, except for state action taken under those statutes specifically mentioned in the Act: the Coastal Zone Management Act, the Clean Air Act, and the Clean Water Act.[26] In other words, the only state action over interstate natural gas pipeline facilities that could be taken pursuant to federal law is state action taken under those statutes. In another provision, Section 19(d), the Natural Gas Act grants jurisdiction to the Courts of Appeals to review state agency action taken pursuant to federal law except for the Coastal Zone Management Act.[27] Applying the statutory construction canon, the express mention of one thing excludes all others, the express exception of the Coastal Zone Management Act from review by the Court of Appeals indicates that Congress intended state actions taken pursuant to the two non-excepted statutes, the Clean Water Act and the Clean Air Act, to be subject to review by the Courts of Appeals. This interpretation is supported by the legislative history of the bill amending Section 19(d), which indicates that the purpose of the provision is to streamline the review of state decisions taken under federally-delegated authority.[28] Thus, a state

---

[26] 15 U.S.C. § 717b(d).

[27] *Id.* § 717r(d)(1).

[28] *See Islander East Pipeline Co. v. Conn. Dep't Envt'l Prot.*, 482 F.3d 79, 85 (2d Cir. 2006) (discussing the legislative history of the judicial review provision); *see also The Energy Policy Act of 2005: Hearing Before the H. Subcomm. on Energy and Air Quality of the Comm. on Energy and*

action taken pursuant to the Clean Water Act or Clean Air Act is subject to review exclusively in the Courts of Appeals. To bar this Court's review of PADEP's actions in permitting an interstate natural gas facility pursuant to the Natural Gas Act and the Clean Water Act would frustrate the purpose of Congress's grant of jurisdiction and render superfluous the explicit exception from federal judicial review of the Coastal Zone Management Act.

### 2. Permits Issued by NJDEP

NJDEP argues we have no jurisdiction over the Freshwater Wetlands Individual Permits or the Water Quality Certifications, and even if we had jurisdiction over those two authorizations, we cannot reach issues regarding aspects of the Freshwater Wetlands Individual Permits that concern transition areas and threatened and endangered species, the Letters of Interpretation, or the Flood Hazard Area Individual Permits. We consider each authorization in turn, and conclude that each is rooted in NJDEP's exercise of authority that it assumed pursuant to Sections 401 and 404 of the Clean Water Act.

---

*Commerce*, 109th Cong. 420 (2005) (statement of Donald F. Santa, Jr., President, Interstate Natural Gas Association of America) (observing that "[a]lthough state regulatory action [is] preempted" by the Natural Gas Act, "state action pursuant to federally delegated authority" is not, and prior to passage of the Natural Gas Act's amendments, review of state permitting decisions could "frustrate pipeline projects already found by FERC to meet the public convenience and necessity." (internal quotation marks omitted)).

18

First, with respect to NJDEP's argument that we lack jurisdiction over the Freshwater Wetlands Individual Permits and the Water Quality Certifications, New Jersey's Freshwater Wetlands Protection Act provides for the state's administration of Section 404 permits, and its implementing regulations make clear a permit issued under the Act, called the Freshwater Wetlands Individual Permit, "constitutes" the Water Quality Certification.[29] Given that the Natural Gas Act provides this Court with jurisdiction to review state authorizations issued pursuant to the Clean Water Act, this Court has jurisdiction over the Freshwater Wetlands Individual Permits and the Water Quality Certifications.

Next, NJDEP argues that those portions of the Freshwater Wetlands Individual Permit that address state threatened and endangered species are governed by state law rather than the Clean Water Act, and thus are not subject to our review. A Freshwater Wetlands Individual Permit may be issued only if the regulated activity "[w]ill not destroy, jeopardize[,] or adversely modify a present or documented habitat for threatened or endangered species . . . ."[30] In issuing the permits, NJDEP imposed conditions on the proposed activity for the protection of state threatened and endangered species. Given that the Freshwater Wetlands Individual Permit constitutes both the Section 404 permit and the Water Quality Certification, and that, under Section 401 of the Clean Water Act, "any other appropriate requirement of state law set forth in [the] certification" will be treated as a condition on the federal permit affected by the certification—

---

[29] N.J. Admin. Code § 7:7A-2.1(d).

[30] *Id.* § 7:7A-7.2(b)(3).

19

in this case, the Section 404 permit[31]—the conditions that protect threatened and endangered species are part of the Freshwater Wetlands Individual Permit, and we have jurisdiction to review these conditions.

Under similar reasoning, we have jurisdiction over the Flood Hazard Area Individual Permits. The Freshwater Wetlands Protection Act requires compliance with the Flood Hazard Act.[32] Accordingly, Transco applied for and obtained Flood Hazard Area Individual Permits, which enumerate conditions on activities in flood hazard areas to protect water quality. The Flood Hazard Area Individual Permit is, in effect, a set of conditions on the Freshwater Wetlands Individual Permit. Given that we have jurisdiction over the Freshwater Wetlands Individual Permit, we have jurisdiction over the Flood Hazard Area Individual Permit as conditions set forth in the Water Quality Certification.

Likewise, the Letters of Interpretation are part and parcel of the Freshwater Wetlands Individual Permits, and thus subject to this Court's review. New Jersey regulations require an applicant for a Freshwater Wetlands Individual Permit to submit the Letter of Interpretation as part of the application package if a Letter has been issued, or "[i]f the applicant applies for [a Freshwater Wetlands Individual Permit] without first obtaining [a Letter of Interpretation], the permit application must include all information that would be necessary for the Department to issue [a Letter of Interpretation] for the site . . . . The Department will then

---

[31] 33 U.S.C. § 1341(d).
[32] N.J. Admin. Code § 7:7A-2.1; *see, e.g.*, *id.* §§ 7:7A-4.3(b)(8), (9), 7.2(b)(10).

20

review the submitted wetland delineation as part of the permit review process."[33]   In other words, a Freshwater Wetlands Individual Permit application must include either an issued Letter of Interpretation or all the materials required for NJDEP to issue such a Letter.   Therefore, the Letters of Interpretation are integral to the Freshwater Wetlands Individual Permit application and the review process of the permit, and thus subject to our review.

## B.    Mootness

We next consider NJDEP and Transco's argument that the petition for review is moot because construction is complete and Transco has been conducting mitigation and restoration.   Thus, any procedural remedy would be ineffectual.  The Foundation argues the petition is not moot because we can provide relief in the form of additional analysis of environmental impact and measures to address those effects.

Mootness raises both constitutional and prudential concerns.[34]  Under Article III, "[i]t is a basic principle . . . that a justiciable case or controversy must remain extant at all stages of review . . . ."[35]  Prudentially, a court may decline to exercise discretion to grant declaratory and injunctive relief if

---

[33] *Id*. § 7:7A-3.1(h).

[34] *Marcavage v. Nat'l Park Serv.*, 666 F.3d 856, 862 n.1 (3d Cir. 2012) (citing *Int'l Bhd. of Boilermakers v. Kelly*, 815 F.2d 912, 915 (3d Cir. 1987)).

[35] *Decker v. Nw. Envtl. Def. Ctr.*, 133 S. Ct. 1326, 1335 (2013) (quoting *United States v. Juvenile Male*, 564 U.S. 932, 936 (2011)).

a controversy is "so attenuated" that considerations of prudence and comity counsel withholding relief.[36] The central question in a mootness analysis is "whether changes in circumstances that prevailed at the beginning of the litigation have forestalled any occasion for meaningful relief."[37] A case becomes moot "only when it is impossible for a court to grant any effectual relief whatever to the prevailing party."[38] When a court can fashion "some form of meaningful relief" or "impose at least one of the remedies enumerated by the appellant," even if it only partially redresses the grievances of the prevailing party, the case is not moot.[39] The Foundation challenges NJDEP's conclusions regarding the proposed pipeline's environmental impact and the amount of mitigation required.

This case is not moot because NJDEP may monitor mitigation outcomes following completion of mitigation. Specifically, pursuant to New Jersey regulation and as set forth in the Freshwater Wetlands Individual Permits and the Flood Hazard Area Individual Permits, Transco must submit annual reports to NJDEP for three years after completing mitigation, and NJDEP may monitor the progress of remedial actions. If mitigation has not met the requirements in the

---

[36] *Int'l Bhd. of Boilermakers*, 815 F.2d at 915-16 n.3.

[37] *Jersey Cent. Power & Light Co. v. New Jersey*, 772 F.2d 35, 39 (3d Cir. 1985) (citing *Mills v. Green*, 159 U.S. 651, 653 (1985)).

[38] *Decker*, 133 S. Ct. at 1335 (quoting *Knox v. Serv. Emps. Int'l*, 132 S. Ct. 2277, 2287 (2012)).

[39] *In re Cont'l Airlines*, 91 F.3d 553, 558 (3d Cir. 1996); *Isidor Paiewonsky Assocs. v. Sharp Props., Inc.*, 998 F.2d 145, 152 (3d Cir. 1993).

regulations, NJDEP may direct Transco to perform additional mitigation or other remedial action.[40] Therefore, there remains possible effectual relief because further environmental analysis might lead NJDEP to require additional mitigation from Transco. Thus, we conclude that this petition is not moot.[41]

### C. Sovereign Immunity

NJDEP and PADEP contend that any challenge brought under Section 19(d) is barred by the Eleventh Amendment. With respect to the Water Quality Certifications and Section 404 permits, NJDEP and PADEP argue that their mere participation in the Clean Water Act permitting process does not waive their sovereign immunity provided by the Eleventh Amendment. NJDEP further argues that when it assumed authority to administer Section 404, it explicitly

---

[40] N.J. Admin. Code § 7.7A-15:16(c)-(f); *see* N.J. Admin. Code § 7:13-10.2(u)(5); N.J. JA 18-19, 35-37 ("The permittee shall monitor forested and/or shrub scrub wetland mitigation projects for 5 full growing seasons and emergent wetland or State open water mitigation projects for 3 full growing seasons beginning the year after the mitigation project has been completed . . . The permittee shall monitor the riparian project for at least 3 years beginning the year after the riparian zone compensation project has been completed.") (Freshwater Wetlands Individual Permits and Flood Hazard Area Individual Permits, Pleasant Run Loop and Skillman Loop).

[41] *See Sierra Club v. U.S. Army Corps of Eng'rs*, 803 F.3d 31, 43 (D.C. Cir. 2015) (citing *Church of Scientology of Cal. v. U.S.*, 506 U.S. 9, 12-13 (1992)).

reserved its sovereign immunity for Section 404 actions through a Memorandum of Agreement with the EPA. Therefore, according to NJDEP, sovereign immunity bars this Court from reviewing the Freshwater Wetlands Individual Permits, Flood Hazard Area Individual Permits, and Letters of Interpretation. These arguments are unavailing. As discussed below, we hold that New Jersey and Pennsylvania's voluntary participation in the regulatory schemes of the Natural Gas Act and the Clean Water Act constitutes a waiver of sovereign immunity, given the clear language in those statutes subjecting their actions to federal review.

### 1.    Overview

The Eleventh Amendment of the United States Constitution states that federal courts may not hear "any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State . . . ." [42]   Courts have interpreted the amendment as applying to suits against states by their own citizens as well,[43] and have extended the immunity to state agencies.[44]   The immunity from suit is not absolute; Congress has limited power to abrogate the states' immunity.[45]

A state may waive its immunity by engaging in conduct that demonstrates the state's consent to suit in federal

---

[42] U.S. Const. Amend. XI.

[43] *See Hans v. Louisiana*, 134 U.S. 1 (1890).

[44] *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984).

[45] *See Seminole Tribe of Fla. v. Florida*, 517 U.S. 44 (1996).

court.[46]    A state may consent to suit in federal court by accepting a gift or gratuity from Congress when waiver of sovereign immunity is a condition of acceptance.[47]    When Congress makes a gift to a state that Congress is not obligated to make and which the state cannot claim as a matter of right, Congress may attach conditions to this gift, including a waiver of sovereign immunity.[48]  These "gifts" need not only be monetary awards; a congressional grant of regulatory authority that a state may not otherwise possess is also a gift. We addressed the theory of "gratuity waiver" as applied to a grant of regulatory authority in *MCI Telecommunications Corporation v. Bell Atlantic Pennsylvania*, where Pennsylvania's Public Utility Commission argued that a section of the Telecommunications Act of 1996,[49] which provides for federal court review of state-approved interconnection agreements, violated the agency's Eleventh Amendment immunity.[50]  We held that Congress had made

---

[46] *See Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 241 (1985); *Clark v. Barnard*, 108 U.S. 436, 447 (1883).

[47] *See College Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 686-87 (1999) (holding that while states may not constructively waive immunity to Lanham Act claims based on term in Trademark Remedy Clarification Act, waiver may be a proper condition on authority granted by Congress that the state would not otherwise have).

[48] *Id.*; *see Petty v. Tenn.-Mo. Bridge Comm'n*, 359 U.S. 275 (1959); *see also South Dakota v. Dole*, 483 U.S. 203, 206 (1987) (holding that Congress may attach conditions to the receipt of federal funds).

[49] Pub. L. No. 104-104, 110 Stat. 56 (codified in scattered sections of 47 U.S.C.).

[50] 271 F.3d 491 (3d Cir. 2001).

federal judicial review a necessary condition of state participation in regulation of telecommunications. A state's participation in the regulatory scheme constituted acceptance of the gift, and, thus, a waiver of Eleventh Amendment immunity.[51] Nevertheless, mere acquiescence is insufficient to abrogate sovereign immunity. A state's gratuity waiver must be knowing and voluntary.[52] In other words, Congress must make its intention to condition acceptance of a gratuity on the waiver of Eleventh Amendment immunity "unmistakably clear."[53]

## 2. Sovereign Immunity and Section 19(d)

Here, the application of the gratuity waiver doctrine is consistent with precedent of our sister courts and supported by the language of Section 19(d) of the Natural Gas Act. In *Islander East Pipeline Company v. Connecticut Department of Environmental Protection*,[54] the Second Circuit recognized that the Natural Gas Act strips states of any authority to regulate a particular field—in this case, interstate natural gas transmission facilities—save certain "rights of the states" granted under those three enumerated statutes, one of which is the Clean Water Act.[55] Consistent with this doctrine, a state participates in Clean Water Act regulation of interstate natural gas facilities by congressional permission, rather than

---

[51] *MCI*, 271 F.3d at 510.

[52] *College Sav. Bank*, 527 U.S. at 675 (citing *Beers v. Arkansas*, 61 U.S. 527, 529 (1857)).

[53] *MCI*, 271 F.3d at 506.

[54] 482 F.3d 79 (2d Cir. 2006).

[55] *Islander*, 482 F.3d at 90.

through inherent state authority.[56]   A state may refuse the grant of authority:  under the Clean Water Act, a state's non-participation in water quality regulation returns authority to the EPA.  A state also may decline to exercise its authority to issue an applicant a Water Quality Certification, and in so doing waive the requirement for a Water Quality Certification, and the proposed activity proceeds without a Water Quality Certification.[57]  In the context of an interstate natural gas facility, a state's refusal to issue a Water Quality Certification would waive the need for the facility to obtain a Certification in order to satisfy conditions of FERC's certificate of public convenience and necessity.  In effect, such a refusal would return the state's delegated authority to enforce Section 401 of the Clean Water Act to FERC with respect to the project.[58]  Therefore, state participation in the regulatory schemes of the Clean Water Act and under the framework of the Natural Gas Act constitutes a gratuity waiver.

We agree with the *Islander* court that the principle of gratuity waiver applies to the regulatory scheme established by the Natural Gas Act.  Section 19(d) grants the Courts of Appeals jurisdiction to review "state agency action."  This language is unambiguous.  New Jersey and Pennsylvania's participation in the regulatory scheme of the Clean Water Act with respect to interstate natural gas facilities, pursuant to the

---

[56] *Id.*

[57] 33 U.S.C. § 1341(a)(1).

[58] *See* 15 U.S.C. § 717b(d) (providing that the NGA does not affect the rights of states under the Clean Water Act); *id.* § 717f(e) (allowing FERC to attach reasonable conditions to a certificate of public convenience and necessity).

27

Natural Gas Act and after the amendment of Section 19(d), constitutes a waiver of their immunity from suits brought under the Natural Gas Act. In effect, Section 19(d) creates a small carve out from sovereign immunity. Under this limited carve out, federal judicial review is proper over those state actions regarding interstate natural gas facilities pursuant to the Clean Water Act and the Clean Air Act.

For these reasons, we have jurisdiction over the petitions. We therefore turn to the merits of these petitions.

## IV.    Merits Challenges

### A.    Standard of Review

The standard of review of state action pursuant to the Clean Water Act for an interstate natural gas facility is a matter of first impression for this Court. Consistent with our precedent in *MCI*, which dealt with a similar regulatory arrangement, we review *de novo* state agency interpretation of federal law, and review under the arbitrary and capricious standard state action taken pursuant to federal law.[59] Agency action is arbitrary and capricious when the agency fails to "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made."[60] When we review an agency action under this standard, the Administrative Procedure Act (APA) directs us to take

---

[59] *MCI*, 271 F.3d at 516; *see Islander*, 482 F.3d at 93-94.
[60] *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks omitted).

account of "the rule of prejudicial error."[61]  In other words, we apply a "harmless error" analysis to any administrative action we review;[62] mistakes that have no bearing on the substantive decision of an agency do not prejudice a party.[63] The party challenging the agency determination bears the burden of demonstrating prejudice.[64] Where an agency errs in fact finding, we remand only if the agency relied on the erroneous finding in its decision.[65]

### B.    New Jersey

The Foundation alleges four general problems with NJDEP's issuance of the Freshwater Wetlands Individual Permits, the Flood Hazard Area Individual Permits, the Water Quality Certifications, and the Letters of Interpretation:  (1) NJDEP deprived the Foundation of sufficient opportunity to comment, (2) NJDEP issued the Freshwater Wetlands Individual Permits based on unsupported conclusions, (3) NJDEP erred in determining that Transco met the requirements for the Flood Hazard Area Individual Permits and hardship exceptions for those permits, and (4) NJDEP misconstrued regulation in granting a minor modification for the Freshwater Wetlands Individual Permit of the Skillman

---

[61] 5 U.S.C. § 706.

[62] *Shinseki v. Sanders*, 556 U.S. 396, 406 (2009) (comparing a similarly worded provision applying to appeals of Veterans Affairs claims decisions).

[63] *See Mass. Trs. of E. Gas & Fuel Assocs. v. United States*, 377 U.S. 235, 248 (1964).

[64] *Sanders*, 556 U.S. at 409.

[65] *See Communist Party of U.S. v. Subversive Activities Control Bd.*, 367 U.S. 1, 67 (1961).

Loop.  We address each in turn and conclude that NJDEP did not act arbitrarily or capriciously with respect to the first three alleged errors.  We hold that the fourth challenge is not properly before this Court.

### 1.    Opportunity for Public Comment

State regulations require NJDEP, after determining an application to be administratively complete, to publish a notice of the application in the DEP Bulletin, make the application available at its offices in Trenton, and, in some circumstances, hold a public hearing.[66]  The public may comment on the application within 30 days of the notice.[67]  The Department "shall consider all written public comments submitted within this time" and "may, in its discretion, consider comments submitted after this date[,]" although state regulations do not define "consider."[68]  The Foundation alleges that NJDEP committed two errors that deprived the Foundation of the opportunity to comment on Transco's application.    First, the Foundation argues that NJDEP prematurely determined that Transco's application was "administratively complete," a designation that triggers the public notice and comment process, even though Transco had failed to include a required element of the application.  Second, the Foundation argues that NJDEP failed to provide proper notice to the public of Transco's application because NJDEP's initial notice of Transco's application in the DEP bulletin cited only Hunterdon County as the project location

---

[66] N.J. Admin. Code §§ 7:7A-12.1, .3, & .4.

[67] *Id*. § 7:7A-12.3(d).

[68] *Id*.; *see In re Freshwater Wetlands Gen. Permits*, 860 A.2d 450, 461-462 (N.J. Super. Ct. App. Div. 2004).

and omitted three other affected counties—Somerset, Princeton, and Mercer.

Although the Foundation argues that it was deprived of an opportunity to comment on the revisions because Transco submitted the revised analysis after the close of the public comment period, the Foundation reviewed the revised analysis and submitted additional written comments from its members and two drilling experts and had a face-to-face meeting with NJDEP to express its continued concern with the proposal. The record shows that NJDEP asked Transco to respond to the concerns raised. A party challenging the sufficiency of the public comment process bears the burden of showing it was prejudiced by the lack of opportunity to comment.[69] The fact that NJDEP ultimately did not adopt the Foundation's view does not mean that the Foundation lacked the opportunity to put forth that view.[70]

Similarly, petitioners were not harmed by the omission of three counties from the initial notice because Princeton Ridge Coalition and Stony Brook-Millstone Watershed Association—both located in the initially omitted counties—were aware of the proposal well before the offending initial notice was published. As early as 2013, both had met with NJDEP and Transco regarding the proposed project and provided written comments. Therefore, the Foundation has

---

[69] *Am. Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 237 (D.C. Cir. 2008).

[70] *Friends of the Atglen-Susquehanna Trail, Inc. v. Surface Transp. Bd.*, 252 F.3d 246, 265 (3d Cir. 2001) (noting the agency was required to consider the comments but was "not required to follow the comments").

failed to demonstrate that it was deprived of the opportunity to comment. For that reason, NJDEP's actions were not arbitrary or capricious.

## 2. Agency Analysis on Environmental Impact of Proposal

New Jersey regulations require NJDEP to analyze the environmental impact of the proposed activity, such as the activity's potential effect on water quality, the aquatic ecosystem, and threatened and endangered animals. The Foundation alleges NJDEP acted in an arbitrary and capricious manner because NJDEP (1) failed to adequately analyze alternatives to the proposed activity that would be less environmentally-adverse or result in the minimum feasible impairment of the aquatic ecosystem, (2) defined the project purpose in such a narrow manner as to exclude potential alternatives to the proposed activity, (3) improperly concluded that the proposed activity in connection with the Skillman Loop will not harm threatened or endangered species or their habitats, and (4) improperly determined that the proposal is in the public interest.

### a. Consideration of Alternatives

New Jersey regulations require NJDEP to issue a Freshwater Wetlands Individual Permit only if certain prerequisites are met. As relevant to this petition, New Jersey regulation requires NJDEP to consider practicable alternatives to the proposed activity that "would have a less adverse impact on the aquatic ecosystem or would not involve a freshwater wetland or State open water" and "would not have other significant adverse environmental consequences . .

32

. ."[71] Where Transco rejected alternatives on the basis of constraints such as inadequate zoning, infrastructure, or parcel size, NJDEP must consider whether Transco made reasonable attempts to remove or accommodate those constraints.[72] In addition, when a regulated activity would take place in wetlands or waters deemed of "exceptional resource value" or related to trout production, NJDEP must consider whether there is a compelling public need for the activity and whether denial of the permit would impose extraordinary hardship on the applicant.[73]

The Foundation claims that NJDEP insufficiently considered alternatives, including those that would have resulted in the minimum feasible environmental alteration or impairment of the aquatic ecosystem. The Foundation also alleges that NJDEP failed to rebut the presumption that the proposed activity has a practicable alternative—such as in size, scope, configuration, density, or design—that would avoid impact or have a lesser impact, a required analysis because the project is a "non-water dependent activity."[74]

The record shows NJDEP considered potential alternatives, such as replacing the existing pipeline with a larger one rather than constructing a new loop, increasing operating pressure within the existing loop, and building various alternative routes. NJDEP weighed the options, adopted some, and rejected others as impractical. Specifically, NJDEP required Transco to reduce the size of the construction workspace in regulated areas, substitute less

---

[71] N.J. Admin. Code § 7:7A-7.2(b).

[72] *Id.* § 7:7A-7.4(c).

[73] *Id.* § 7:7A-7.5.

[74] *Id.* § 7:7A-7.4.

33

environmentally-adverse crossing techniques for six wetlands, and use specific drilling methods at three locations to reduce impacts. NJDEP provided explanation for those alternatives not adopted. For example, the use of horizontal direct drilling and direct pipe drilling at certain locations would be more costly and carried the risk of equipment failure, damage to the pipe, and inadvertent release of drilling fluid into the soil. Similarly, alternative routes were impracticable because they might interfere with an existing water line or cause greater land or wetland disturbance.

Additionally, NJDEP considered whether the proposed activity would affect wetlands or waters categorized as "exceptional resource value" or related to trout production. NJDEP noted that wetlands in the Pleasant Run Loop were neither of exceptional resource value nor trout-producing, and that, although certain wetlands in the Skillman Loop were of exceptional resource value, compelling public need for the project outweighed the impact on wetlands and waters.

NJDEP not only considered but also acted upon alternatives, in direct contrast to the Foundation's allegations. Adoption of alternatives reduced open water and wetland disturbance by 38 percent for the Pleasant Run Loop and 48 percent for the Skillman Loop, according to an NJDEP analysis. For the Skillman Loop, NJDEP consideration of alternatives led to the selection of the shortest proposed route, of which 86 percent is collocated within Transco's existing pipeline right-of-way. NJDEP also required those portions not collocated to be constructed with a specific drilling technique to reduce wetland disturbance. Therefore, NJDEP's actions were not arbitrary or capricious.

34

### b. Definition of Project Purpose

Next, the Foundation charges NJDEP defined the project purpose in such way as to preclude alternatives, by including a durational limitation as part of the purpose. The limitation rendered impracticable those construction methods that are less environmentally-adverse but more time-consuming.[75] The Foundation's challenge relies on language regarding project purpose in New Jersey regulations on practicable alternatives. Regulations define "practicable alternative" as "other choices available and capable of being carried out after taking into consideration cost, existing technology, and logistics in light of *overall project purposes* . . ."[76] However, neither New Jersey regulations nor case law defines the term "project purpose." For the present project, NJDEP stated that the project purpose was "to construct the pipeline and . . . to begin service through the proposed pipeline by . . . December 31, 2015."[77] A "short construction window" for the project was recommended by the U.S. Army Corps of Engineers to reduce disturbance to waterbodies, and FERC discussed temporal limitations on construction in its order granting the certificate of public convenience and necessity.[78] Given this concern, NJDEP considered the

---

[75] Pet. Br. 46.

[76] N.J. Admin. Code § 7:7A-1.4 (emphasis added).

[77] *See* N.J. JA 1302 (NJDEP Staff Summary Report, Pleasant Run Loop).

[78] *E.g., Transcontinental Gas Pipe Line Co. LLC*, 149 FERC ¶ 61,258, 62,686 (2014) ("Back Brook . . . will be crossed within a 48 hour period . . . which will maintain water flow during construction and avoid in-stream construction impacts.").

duration of disturbance of water bodies in choosing a drilling method, in addition to other factors, such as the number of trees that would need to be cleared to provide space for worksites. Therefore, NJDEP's incorporation of a temporal term into the project purpose was not arbitrary and capricious.

### c. Conclusions Regarding Threatened or Endangered Species in the Skillman Loop

The Foundation alleges that NJDEP ignored reports by the Princeton Ridge Coalition that the project would adversely affect the Red-shouldered Hawk and Barred Owl and that it failed to impose conditions in the Freshwater Wetlands Individual Permit for the Skillman Loop to address these impacts. A Freshwater Wetlands Individual Permit may be issued only if NJDEP determines that the regulated activity "[w]ill not destroy, jeopardize[,] or adversely modify a present or documented habitat for threatened or endangered species; and shall not jeopardize the continued existence of a local population of a threatened or endangered species . . . ."[79] NJDEP stated in its Staff Summary Reports, "[t]he project right-of-way is documented and suitable habitat for . . . Barred Owl, Red-shouldered Hawk, Wood Turtle, Indiana Bat, and Northern Long-eared Bat."[80] In the Freshwater Wetlands Individual Permit for the Skillman Loop, NJDEP imposed conditions to protect most of the enumerated species but not the Barred Owl or Red-shouldered Hawk. Nevertheless, NJDEP stated in its Staff Summary Report that "[p]rovided the conditions of the permits are followed . . . no

---

[79] N.J. Admin. Code § 7:7A-7.2(b)(3).

[80] N.J. JA 1426 (Freshwater Wetlands Individual Permit, Skillman Loop).

36

adverse impacts are anticipated upon threatened/endangered species." To explain why it did not impose conditions to protect the species, NJDEP filed with this Court affidavits from a staff member who explained her review of Transco's application and the Foundation's reports, and her consideration of factors such as limited sightings of the species, small sizes of the wetlands, and fragmentation of habitat because of open areas and neighboring homes. Based on these considerations, NJDEP determined it would not impose conditions on the permit regarding the Barred Owl or Red-shouldered Hawk. The Foundation argues that NJDEP's submission constitutes an attempt to supplement the administrative record after the fact. The administrative record is supposed to reflect the information available to the decision maker at the time the challenged decisions were made, as well as the rationale for why the agency acted as it did, but "since the bare record may not disclose the factors that were considered or the [agency's] construction of the evidence," it is sometimes appropriate to look to further explanation from agency officials to ascertain this rationale.[81] Here, the affidavits explain staff review conducted *prior to* issuance of the permit. Therefore, the submissions do not constitute *post hoc* rationalization of agency action. The Foundation has not demonstrated that NJDEP failed to consider potential adverse impacts in issuing the Freshwater Wetlands Individual Permit for the Skillman Loop.

### d. Public Interest Analysis

---

[81] *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 420 (1971) (*abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977); *see Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 50.

To issue a Freshwater Wetlands Individual Permit, NJDEP must determine the proposal is "in the public interest" on the basis of seven factors.[82] The Foundation argues NJDEP failed to consider five of the seven factors:

> [1] The public interest in preservation of natural resources and the interest of the property owners in reasonable economic development . . .;
>
> [2] The extent and permanence of the beneficial or detrimental effects which the proposed regulated activity may have on the public and private uses for which the property is suited;
>
> [3] The quality and resource value classification pursuant to N.J.A.C. 7:7A-2.5 of the wetland which may be affected and the amount of freshwater wetlands to be disturbed;
>
> [4] The economic value, both public and private, of the proposed regulated activity to the general area; and
>
> [5] The functions and values provided by the freshwater wetlands and probable individual and cumulative impacts of the regulated activity on public health and fish and wildlife . . . .[83]

NJDEP did not fail to consider these factors. Regarding the first factor, the record shows consideration of

---

[82] N.J. Admin. Code § 7:7A-7.2(b)(12).
[83] *Id.*

38

impact on landowners, surrounding communities, and the environment. For example, NJDEP sought to minimize any adverse economic impact by requiring the use of existing rights-of-way and areas adjacent and the installation and modification of compressors within existing compressor station facilities. As for the second factor, NJDEP considered the extent of any detrimental effects and required Transco to implement best management practices during construction and restoration to limit disturbance to the immediate construction and restoration period and avoid permanent detrimental effects.

Likewise, regarding the third factor, NJDEP reviewed submissions, inspected sites to verify wetland and water boundary lines, and made wetlands resource value classifications as set forth in the Letters of Interpretation. In determining whether the proposal is in the public interest, NJDEP considered that wetlands in the Pleasant Run Loop were not of exceptional resource value, and that certain wetlands in the Skillman Loop were of exceptional resource value. Similarly, with respect to the proposed activity's public and private economic value, NJDEP found that the project would provide public and private economic value by expanding Transco's pipeline system capacity and serving end-users. Finally, the record shows NJDEP considered the functions and values provided by the freshwater wetlands and probable impact of the activity on public health and fish and wildlife. NJDEP examined the wetlands' fishery resources, resource value classification, and its role as habitat for endangered and threatened species. The Department also considered the scale and duration of disturbance of the wetlands, and whether the proposed activity would discharge toxic effluent or degrade ground or surface water.

The record rebuts the Foundation's charge that NJDEP reached its public interest determination without considering the appropriate factors. We therefore hold that NJDEP did not act arbitrarily or capriciously in issuing the Freshwater Wetlands Individual Permits.

### 3. Flood Hazard Area Individual Permits

The Foundation claims that NJDEP erred by (1) impermissibly issuing the Flood Hazard Area Individual Permit for the Skillman Loop because the Flood Hazard Area Control Act also prohibits the issuance of permits for activities that would adversely affect state threatened or endangered species and their habitats; and (2) improperly determining that Transco met the requirements of a hardship exception for the permits.

Regarding the first allegation, the Flood Hazard Area Control Act, similar to the Freshwater Wetlands Protection Act, requires NJDEP to determine that any proposed activity will not adversely affect threatened or endangered species or their habitats before issuing a Flood Hazard Area Individual Permit.[84] The Foundation alleges that NJDEP failed to consider the expert reports, which concluded that the clearing of forest canopy over riparian zones for construction would increase fragmentation of mature forest and thus damage the habitat of the Red-Shouldered Hawk and the Barred Owl. The record shows that NJDEP considered the expert reports because, after the Foundation submitted its expert reports, in a March 11, 2015, letter, NJDEP directed Transco to address

---

[84] N.J. Admin. Code § 7:13-10.6(d).

the Department's concern of "significant adverse impacts" on habitat areas of threatened or endangered species and to consider alternative construction methods. In a March 17, 2015, letter, Transco addressed NJDEP's concern by developing "a unique construction approach" that allowed Transco to cut "25 feet off of a typical 75 foot [worksite] corridor through environmentally sensitive areas" so that fewer trees would be removed and the impact of construction on the forest would be "half of what is typically required." That NJDEP directed Transco to revise its application and address the Department's concerns demonstrates NJDEP considered potential adverse environmental impact on habitats. Therefore, the grant of a Flood Hazard Area Individual Permit for the Skillman Loop was not arbitrary or capricious.

As to the second allegation, the Foundation argues that NJDEP incorrectly determined that Transco met the requirements of a hardship exception for the Flood Hazard Area Individual Permits. Transco had requested hardship exceptions in its applications because the Skillman Loop would affect 13.2 acres of riparian zone vegetation, and Pleasant Run Loop 7.54 acres, both exceeding regulatory limits.[85] A hardship exception requires the applicant to demonstrate:

> (1) Due to an extraordinary situation of the applicant or site condition, compliance with this chapter would result in exceptional and/or undue hardship for the applicant; (2) The

---

[85] N.J. Admin. Code § 7:13-10.2, Table C, Maximum Allowable Disturbance to Riparian Vegetation.

41

proposed activities will not adversely affect the use of contiguous or nearby property; (3) The proposed activities will not pose a threat to the environment or to public health, safety, or welfare; and (4) The hardship was not created through the action or inaction of the applicant or its agents.[86]

In addition, one or more of the following requirements must be met:

1. The Department determines that there is no feasible and prudent alternative to the proposed project, including not pursuing the project, which would avoid or substantially reduce the anticipated adverse effects of the project, and that granting the hardship exception would not compromise the reasonable requirements of public health, safety and welfare, or the environment;

2. The Department determines that the cost of compliance with the requirements of this chapter is unreasonably high in relation to the environmental benefits that would be achieved by compliance; and/or

3. The Department and applicant agree to one or more alternative requirements that, in the judgment of the Department, provide equal or

---

[86] *Id*. § 7:13-9.8(b).

better protection to public health, safety and welfare and the environment.[87]

Further, because the proposed construction would cross regulated waters, NJDEP must find that the construction of an open trench through the riparian zone is necessary to install the pipeline.[88]

NJDEP's grant of hardship exceptions was not arbitrary or capricious. Although neither New Jersey regulations nor case law defines the term "hardship" as used here, state regulations indicate that the nature of the hardship may be economic, related to impact from floods, or otherwise subject to NJDEP's determination.[89] NJDEP determined that Transco addressed all the requirements, namely, that (1) there was not a feasible and prudent alternative; (2) the method of construction was necessary for safety; (3) granting the exception would not compromise reasonable requirements of public health, safety and welfare, or the environment; and (4) requiring compliance would impose a hardship on Transco, which Transco did not create through action or inaction. Given these determinations, we hold that the Department did not act arbitrarily or capriciously in granting the hardship exceptions to the Flood Hazard Area Individual Permits.

**4.    Grant of Minor Modification to the Freshwater Wetlands Individual Permit for the Skillman Loop**

---

[87] *Id*. § 7:13-9.8(a), 10.2(s).

[88] *Id*. § 7:13-10.2(k)(1)(i).

[89] *See id*. § 7:13-9.8.

The Foundation challenges NJDEP's grant of a minor modification for Transco's Freshwater Wetlands Individual Permit for the Skillman Loop as contrary to New Jersey regulation. After hard rock and boulders under wetlands in the Princeton Ridge damaged drilling equipment, Transco sought a minor modification to the permit to use a different drilling method than the method NJDEP had originally permitted. By regulation, a modification of the Freshwater Wetlands Individual Permit is "minor" if it involves

> [a] change in materials, construction techniques, or the minor relocation of an activity on a site, *if the change is required by another permitting agency*. However, this change is not a minor modification if the change would result in additional wetland, State open water or transition area impacts over those of the original permit or waiver.[90]

In granting the minor modification, NJDEP concluded FERC was the requisite "permitting agency" that required the change, because in approving the particular route of the Skillman Loop, FERC implicitly required the change in drilling technique to maintain the route. NJDEP also concluded the change in drilling method would not result in additional disturbance.

This challenge is not properly before us. At the time of the filing of the petition, the challenged agency action must

---

[90] *Id*. § 7:7A-14.3(c)(4) (emphasis added).

be ripe for review.[91]  The Foundation petitioned for review on May 8, 2015, but the minor modification was not applied for until May 29, 2015, and granted on June 4, 2015.

Based on the foregoing, we hold NJDEP did not deprive the Foundation of sufficient opportunity to comment and did not act arbitrarily or capriciously in issuing permits and other authorizations.  We further hold the challenge of the minor modification for the Freshwater Wetlands Individual Permit of the Skillman Loop is not properly before this Court.

### C.    Pennsylvania

The Riverkeeper raises two challenges to PADEP's issuance of a Water Quality Certification:  (1) PADEP failed to review an environmental assessment prepared by Transco before issuing the Water Quality Certification, as required by state regulations; and (2) the materials that PADEP did review were substantively insufficient.  The Riverkeeper has not demonstrated prejudice from these alleged errors.

---

[91] *See TeleSTAR, Inc. v. FCC,* 888 F.2d 132, 133 (D.C. Cir. 1989) (agency action that was not final at the time of filing of petition may only be reviewed upon the filing of another petition); *W. Union Tel. Co. v. FCC*, 773 F.2d 375, 378 (D.C. Cir. 1985) (court lacked jurisdiction over a challenge to a now-final agency action that was filed before action became final); *Pennzoil Co. v. FERC*, 645 F.2d 394, 398 (5th Cir. 1981) (requirement that an agency's action be ripe for judicial review before merits of any review petition will be addressed is one which applies to action of other agencies as well as that of FERC).

### 1.     Sequence of Agency Action

The Riverkeeper's first challenge involves whether PADEP was required to engage in an environmental review prior to issuing a Water Quality Certification, or whether PADEP may, as it did here, postpone environmental review until after a Water Quality Certification has been issued. Although PADEP has not published any procedures for issuing Water Quality Certifications, applicants for the Chapter 105 permits who are required to obtain Water Quality Certifications must "prepare and submit" an environmental assessment for PADEP's review.[92]   The Riverkeeper infers from this requirement that PADEP must review an environmental assessment prepared as part of an application for a Water Quality Certification before issuing a Certification.   Based on this inference, and because PADEP did not do so, the Riverkeeper alleges that PADEP erred by failing to review an environmental assessment prior to issuing a Water Quality Certification to Transco.  PADEP argues that for complex projects that require a large number of state and federal permits to ensure compliance with state water quality standards—such as interstate natural gas pipelines—this sequence is not mandatory and would cause unnecessary delay if strictly followed.[93]

---

[92] 25 Pa. Code § 105.15(b) (2011).

[93] *See Clean Water Act Section 401 State Water Quality Certification: A Water Quality Protection Tool for States and Tribes*, EPA Office of Wetlands, Oceans and Watersheds, 25 (April 2010) (stating that states are not required to implement Water Quality Certification procedures).

The Riverkeeper has failed to demonstrate that it suffered harm from the sequence of PADEP's permitting actions. According to FERC's certificate, Transco could not begin construction until it obtained all applicable authorizations required under federal law. One of these federal authorizations, the Water Quality Certification, was conditioned on the issuance of, *inter alia*, a Chapter 105 Permit. Prior to issuing a Chapter 105 Permit, PADEP was required to review an environmental assessment prepared by Transco. Thus, construction could not begin until after PADEP had reviewed an environmental assessment, regardless of whether this review occurred before the Water Quality Certification was issued. Because environmental review was required before construction could begin, the Riverkeeper was not harmed by the timing of the required review, and PADEP did not act arbitrarily or capriciously.

The Riverkeeper alleges that as a result of PADEP's failure to review the environmental assessment prior to issuing the Water Quality Certification, FERC prematurely authorized tree felling activities. According to the Riverkeeper, in delaying review of the environmental assessment, PADEP postponed substantive determinations until after the issuance of the Water Quality Certification, which allowed trees to be felled in contravention of Pennsylvania water quality standards. The record does not support the Riverkeeper's view of the timeline of events. In fact, FERC authorized tree felling several weeks before PADEP issued the Water Quality Certification. Therefore, the Water Quality Certification could not have led to tree felling because such felling was approved without a Certification.

Moreover, the Riverkeeper is incorrect in assuming that tree-felling is implicated by PADEP's substantive water quality determinations: the Army Corps of Engineers stated that the tree-felling activity for which Transco sought authorization would not trigger the need for permits under the Clean Water Act. FERC designated the tree-felling activity as "pre-construction activity," while FERC's certificate requires a Water Quality Certification only for "construction activity." This suggests that FERC allows tree-felling activity to be authorized without Transco obtaining any Clean Water Act permits. Thus, there is no nexus between the tree felling activity and the Water Quality Certification, and the Riverkeeper's challenge fails.

## 2. Sufficiency of Factfinding

The Riverkeeper alleges that PADEP relied on an incomplete environmental assessment from Transco and failed to correct the assessment's deficiencies prior to issuing the Water Quality Certification. PADEP and Transco counter that the majority of the Riverkeeper's arguments relate not to the issuance of the Water Quality Certification, but the issuance of the Chapter 105 Permit. We find this argument unavailing. Because the Chapter 105 Permit was a condition of the Water Quality Certification, it is inextricably intertwined with the Water Quality Certification.[94] Nevertheless, because the Riverkeeper does not challenge the Chapter 105 Permit specifically and argues only that the Water Quality Certification itself was improperly issued, we

---

[94] *See Tenn. Gas Pipeline Co. LLC. v. Delaware Riverkeeper Network*, 921 F. Supp. 2d 381, 387-88 (M.D. PA. 2013).

will address the Riverkeeper's challenges only as they pertain to the issuance of the Water Quality Certification.

The Riverkeeper alleges two problems with PADEP's environmental review: (1) PADEP relied on incorrect wetlands classifications without gathering data necessary to correct these classifications; and (2) construction activity was improperly authorized because the faulty wetlands classifications led PADEP to ignore construction impacts on exceptional value wetlands. We will consider these arguments in turn.

### a. Wetlands Classifications

Under Pennsylvania regulations, classifying a wetland as "exceptional value"[95] triggers a number of regulatory protections, including a more stringent permitting process that disallows construction where construction will have an "adverse impact" on these wetlands.[96] The Riverkeeper contends that Transco improperly classified wetlands in the application it submitted to PADEP for a Water Quality Certification, because Transco (1) used incorrect

---

[95] "Exceptional value" wetlands are those that serve as habitat for a threatened or endangered species, or are hydrologically connected to, or lie within one half mile of, such a wetland; are located in or along the floodplain of a wild trout stream or a national wild or scenic river, or such a tributary; are located along an existing drinking water supply; or are located in an area designated as a "natural" or "wild" area within a state forest or park or a designated federal wilderness or natural landmark. 25 Pa. Code § 105.17(1).
[96] *See id*. § 105.18a(a).

classification terms, and (2) miscategorized wetlands that are of "exceptional value" as belonging to a lesser protected category. As evidence, the Riverkeeper cites to a table in an environmental assessment prepared by Transco that identified affected Pennsylvania wetlands and their state classifications. This table identifies wetlands as "ordinary," "intermediate," "exceptional," and "other." As the Riverkeeper correctly points out, these terms are not used by PADEP, which classifies wetlands either as "exceptional value" or "other."[97] The Riverkeeper argues that Transco's incorrect classifications frustrated PADEP's ability to determine the correct classification for the affected wetlands and adhere to state water quality standards. In addition, the Riverkeeper alleges that at least eleven wetlands affected are "exceptional value" wetlands but were marked as "ordinary" or "intermediate" in Transco's table. According to the Riverkeeper, PADEP's failure to address these problems is evidence that it has acted arbitrarily and capriciously.[98]

To prevail in its petition, the Riverkeeper must show not only that an error was made but that the error in question prejudiced the Riverkeeper in some way.[99] In this instance, the Riverkeeper can only claim to have suffered prejudice from Transco's classifications if PADEP actually relied on those classifications; otherwise, the error, if any, was harmless. The prejudice the Riverkeeper alleges is simple: PADEP would not have issued the Water Quality

---

[97] *Id.* § 105.17.
[98] *See Pa. Trout v. Dep't Envt'l Prot.*, 863 A.2d 93, 98 (Pa. 2004) (discussing requirements for wetlands classifications).
[99] *See supra* Section IV.A.

Certification if Transco had properly classified wetlands in its environmental assessment.

The Riverkeeper's argument falls short. PADEP is not required to review a project's effect on wetlands prior to issuing a Water Quality Certification. In this case, a review was required before PADEP could issue the Chapter 105 Permit, and Transco had to obtain the Chapter 105 Permit as a condition of the Water Quality Certification.[100] Thus, while Transco may have submitted miscategorized information for the Water Quality Certification, that submission was of no consequence since a full review of the appropriate wetland categories was conducted before the Chapter 105 Permit was issued. PADEP had ample time and opportunity to request that Transco remedy any shortcoming in analysis during these review processes, and the Riverkeeper also had the opportunity to submit its comments on the Chapter 105 Permit as well as other state permits not at issue. No additional review was required before PADEP could issue the Water Quality Certification. There is nothing in the record to indicate that PADEP relied on Transco's miscategorized submission in issuing the Certification. Therefore, we hold that any error in Transco's initial classification of wetlands did not prejudice the Riverkeeper. Because the Riverkeeper has not demonstrated that PADEP relied on these classifications, we need not address the Riverkeeper's argument that PADEP failed to collect and

---

[100] *See* 25 Pa. Code § 105.14(b)(13) (requiring determination of impact on wetlands for Chapter 105 permits); *cf. id*. § 92a.21(d)(3) (allowing PADEP to require an applicant for an NPDES permit to provide information on a project's wetlands impact).

analyze the necessary data to make appropriate wetlands classifications following their receipt of Transco's environmental assessment.

### b.       Authorization of Construction Activity

The Riverkeeper also alleges that PADEP erred in authorizing construction activity that violates state water quality standards.   This challenge is broader than the Riverkeeper's challenge regarding FERC's authorization of tree-felling:   rather than arguing that a sequencing error resulted in some particular activity, the Riverkeeper here alleges that any construction that would follow the issuance of a Water Quality Certification violates Pennsylvania water quality standards.  The Riverkeeper contends that this is true because any construction impact on an exceptional value wetland is "adverse."  According to the Riverkeeper, because construction could not begin without the issuance of the Water Quality Certification, and construction would adversely affect what the Riverkeeper alleges are exceptional value wetlands, PADEP's decision to issue a Water Quality Certification authorized construction activity that violated Pennsylvania water quality standards.   However, PADEP itself has no power to "authorize" construction of interstate natural gas facilities because the only government entity that may do so is FERC.[101]   While FERC would not allow construction to occur without a Water Quality Certification, the Certification is only relevant because it is required by FERC's certificate of public convenience and necessity.  The Natural Gas Act grants FERC exclusive authority to authorize

_____

[101] *See Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 302-04 (citing 15 U.S.C. § 717f(c)).

construction by issuing a certificate of public convenience and necessity, as FERC did here.[102] Any interested party may file a petition with FERC for a hearing on the issuance of a certificate, and we note that the Riverkeeper did participate in such a hearing.[103] In contrast, PADEP's role in the permitting process is to certify that any construction that occurs is in accordance with Pennsylvania water quality standards. PADEP did so here by requiring Transco to obtain various state permits and submit to the review processes associated with these permits.

Because the Riverkeeper has not shown that it was prejudiced by PADEP's permitting actions, we see no reason to disturb PADEP's decision to issue the Water Quality Certification.

## VI.    Conclusion

For the foregoing reasons, we conclude NJDEP and PADEP did not act arbitrarily or capriciously in issuing permits and related authorizations to Transco. We decline to address the challenge of NJDEP's grant of a minor modification to the Freshwater Wetlands Individual Permit of the Skillman Loop. Accordingly, we will deny the petitions.

---

[102] 15 U.S.C. § 717f(c).

[103] *See* 15 U.S.C. § 717n(e); 18 C.F.R. § 156.10.