**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1897-21
               A-2270-21

IN THE MATTER OF PERMIT
NUMBER 0807-21-0002.1
LUP210001 ISSUED BY THE
NEW JERSEY DEPARTMENT
OF ENVIRONMENTAL
PROTECTION TO DELAWARE
RIVER PARTNERS, LLC.

_____

IN THE MATTER OF PERMIT
NUMBER 0807-21-0002.1
LUP210002 ISSUED BY THE
NEW JERSEY DEPARTMENT
OF ENVIRONMENTAL
PROTECTION TO DELAWARE
RIVER PARTNERS, LLC.

_____

Submitted October 24, 2023 – Decided November 21, 2023

Before Judges Gooden Brown and Natali.

On appeal from the New Jersey Department of Environmental Protection.

Kacy C. Manahan, attorney for appellants Delaware Riverkeeper Network and Maya van Rossum, the

Delaware Riverkeeper (Kacy C. Manahan, of counsel and on the briefs).

Matthew J. Platkin, Attorney General, attorney for respondent New Jersey Department of Environmental Protection (Melissa H. Raksa, Assistant Attorney General, of counsel; Kathrine M. Hunt and Kristina Miles, Deputy Attorneys General, on the briefs).

Manko, Gold, Katcher & Fox, LLP, attorneys for respondent Delaware River Partners LLC (Kathleen B. Campbell and Michael Dillon, on the briefs).

PER CURIAM

In these consolidated appeals, the Delaware Riverkeeper Network and Maya van Rossum challenge the Department of Environmental Protection's (DEP) issuance of a Flood Hazard Area Permit, a Waterfront Development Permit, a Coastal Wetlands Permit, a Freshwater Wetlands Permit, and a Water Quality Certificate (the Permits) to Delaware River Partners, LLC (DRP). Those Permits, issued on December 30, 2021 and February 25, 2022, authorize DRP to construct a new railway loop (the Loop) to aid in the delivery of liquid energy products, primarily liquefied natural gas (LNG), to the Gibbstown Logistics Center (GLC), a facility it built on the Delaware River.

Appellants contend DEP acted arbitrarily, capriciously, and unreasonably in issuing the Permits for the Loop. For the reasons that follow, we disagree with all these arguments and affirm.

I.

In light of the numerous issues raised by these appeals, and the necessary consideration of the complex state and federal environmental statutes and regulations at issue, we detail the facts with a greater degree of granularity than ordinary.

In 2016, DRP purchased a portion of property situated on the Delaware River which had previously been used by E.I. du Pont de Nemours and Company (DuPont) as an industrial site known as the DuPont Repauno Works. The site is located near residential areas in Gibbstown, and during its ownership by DuPont, hosted such operations as explosives manufacturing, industrial diamond manufacturing, and storage and shipment of ammonia.

From 1951 to 1986, Atlantic City Electric also operated a power plant on the property and used a pier for the transfer of coal. Railway lines to support operations on the site were constructed in the late 1800s and extended around 1940; they were abandoned "sometime after 1971," and part of the former railway was repurposed as an unpaved roadway. Chemours Co., LLC, a successor to DuPont, is currently engaged in remediation of the historic contamination of the upland areas of the site, under DEP's supervision.

A-1897-21

After purchasing approximately 371 acres of the 1600-acre area, DRP proposed building the GLC, a "multi-use deep-water port and logistics center" intended to replace structures constructed by DuPont in the early 1900s. DRP intended for the GLC to receive and load cargo from and to ships, such as automobiles, other "roll-on/roll-off" cargo, and bulk liquid products including "liquid gases and energy liquid products." On April 10, 2017, DEP issued individual Waterfront Development, Flood Hazard, Coastal Wetland, and Freshwater Wetlands permits to DRP for the GLC's construction. DEP determined that the construction of the GLC satisfied all applicable siting conditions and environmental standards under the Energy Facility Use rule, N.J.A.C. 7:7-15.4, and the Stormwater Management rules, N.J.A.C. 7:8-1.1 to -6.3.

The 2017 permits authorized DRP to dredge 460,000 cubic yards of sediment within a 29-acre area of the Delaware River in order to accommodate a 750-foot-long berth for large vessels and provide access to the structure from the river's navigational channel. The permits also allowed the permanent disturbance of 4.603 acres of freshwater wetlands; DEP included conditions in the permits intended to protect animal habitats and endangered species in the area including sturgeon, bald eagles, and ospreys, and to mitigate wetlands

4 <span>A-1897-21</span>

losses. DRP was also required to comply with a stormwater maintenance plan it had developed for the site. The construction authorized by the 2017 permits is known as the "Dock 1 and Marine Terminal" project (Dock 1/GLC). Neither appellants nor any other party challenged the issuance of these permits.

In 2018, DRP applied for a modification to the Dock 1/GLC permits to allow for changes to the proposed footprint and location of the marine terminal, which would now include "a bulk liquid storage and handling facility for the transfer of [LNG] and other materials." In November of that year, DEP authorized the modification, conditioned upon DRP's compliance with all Toxic Catastrophe Prevention Act Program rules under N.J.A.C. 7:31-1.1 to -11.5. The modified permits were also unchallenged. DRP completed construction of Dock 1 in December 2018, and of a rail transloading rack for liquified petroleum gas in October 2020.

On March 14, 2019, DRP applied to DEP for a new individual Waterfront Development permit, to construct a second dock that would accommodate vessels to export liquid energy products including LNG (Dock 2). Following a public comment period during which appellants sent opposing comments, DEP issued the permit on September 5, 2019. The Dock 2 permit authorized the dredging of 665,000 cubic yards of sediment to provide access by vessels to the

5

new dock. It contained conditions intended to protect water quality, endangered fish and birds, fisheries, and aquatic vegetation during construction of the dock.

Appellants appealed the issuance of the Dock 2 permit, and we affirmed DEP's actions, finding that the agency did not act arbitrarily, capriciously, or unreasonably. In re Challenge of Del. Riverkeeper Network, No. A-709-19 (June 23, 2021) (slip op. at 3). In doing so, we specifically rejected appellants' argument that Dock 2 should have been reviewed by DEP as a separate "energy facility" under N.J.A.C. 7:7-15.4, finding that the new dock was "merely an additional set of two berths" and would not "store," "vaporize," or "receive" LNG "for transmission by pipeline" as that regulation defines such a facility. Id. at 8, 21-22.

We also found that DEP had fully considered the potential impacts to endangered species when issuing both the Dock 2 and original GLC permits. Id. at 25-26. The court further rejected appellants' argument that DEP should have required DRP to obtain a new Industrial Stormwater permit for Dock 2. Id. at 34-37. We found that DRP had shown compliance with the Stormwater Management rules as part of the GLC permitting process by designing a stormwater management system for the facility, and that Dock 2 was not in itself a "major development" requiring any further consideration of those rules under

6

N.J.A.C. 7:8-1.2.  Id. at 36-37.  On September 11, 2020, while that appeal was pending, DRP filed a petition with the Federal Energy Regulatory Commission (FERC) for a declaratory order stating that DRP's proposed LNG transloading operations at the GLC would not be subject to the agency's jurisdiction under the Natural Gas Act (NGA), 15 U.S.C. §§ 717a-717z.  85 Fed. Reg. 59302 (Sept. 21, 2020).

On May 21, 2021, DRP applied for the Permits, authorizing it to construct the Loop, an oval-shaped 11,600 linear foot double-track rail line that will "allow two trains (one loaded and one empty) to be temporarily staged" at the GLC.  As noted, the Loop is intended to facilitate the transloading of bulk liquid cargo, including LNG, liquefied petroleum gas, and other products, from trains onto ships on the Delaware River.  It will connect to an existing adjacent Conrail freight train line, and to the existing transloading rack built as part of the Dock 1/GLC construction.  Currently, the Conrail line "does not have adequate length" to hold the trains while they are unloaded, while still allowing the passage of other rail traffic or vehicular traffic from adjacent roads.  The Loop, which would allow the cargo trains to be unloaded closer to the facility and which would not impede other trains and cars in the area, would thus improve the GLC's efficiency and reduce its impact on the surrounding community.

The Loop will be constructed on an approximately eleven-acre portion of the land belonging to DRP, contiguous to the GLC's marine terminal. Because this land is designated as a waterfront development area and a delineated flood hazard area, and the Loop's creation will impact portions of coastal and freshwater wetlands and transition areas, it is subject to regulation by DEP under the Coastal Wetlands Act (CWA), N.J.S.A. 13:9A-1 to -10, the Waterfront Development Act, N.J.S.A. 12:5-1 to -11, the Freshwater Wetlands Protection Act (FWPA), N.J.S.A. 13:9B-1 to -30, and the Flood Hazard Area Control Act (FHACA), N.J.S.A. 58:16A-50 to -103. DRP is therefore obligated to comply with all relevant DEP regulations promulgated pursuant to those statutes.

The Loop will be built largely upon existing unpaved roadways that run parallel to the Delaware River in the north, a water treatment system ditch called the Sand Ditch Settling Basin to the west, and another existing roadway to the east and south. Approximately 4,600 linear feet of the road along the Sand Ditch was formerly part of the railroad track used by DuPont until the 1970s.

In its permit application, DRP included environmental impact, wetland delineation, and threatened and endangered species habitat assessment reports prepared by Ramboll US Consulting, Inc. In its reports, Ramboll explained DRP's intent to mitigate the Loop's permanent disturbance of wetlands by

purchasing wetland bank credits, and to restore areas of temporary disturbance by removing all construction structures and "reseeding with native vegetation and planting [] native shrubs and trees to promote rapid reestablishment of vegetation."

The reports also indicated that the area of the Loop has not been "designated as critical habitat for any federally-listed threatened or endangered species," but that there are habitats for endangered bald eagles, ospreys, and sturgeon within one-fourth of a mile of the project site. Ramboll stated that the presence of fish in the nearby ditch system is "unlikely due to physical limitations, poor habitat structure, limited food source, and predator influences." Additionally, it noted a tide gate blocks fish from accessing the ditch system from the Delaware River, so sturgeon—which are fairly large as adults—are not expected to be present near the Loop. Ramboll also stated "[f]ishery resources will not be adversely affected" and "no adverse impacts to water quality which would negatively affect fisher[y] resources are expected."

As to birds, Ramboll explained the affected wetlands would "likely be assigned a resource value of Exceptional" under N.J.A.C. 7:7A-3.2(b) due to "the recorded occurrence of bald eagle[s]" in the vicinity. It noted, however, that no construction would occur within 1,000 feet of a known, active bald eagle

nest, and trains on the Loop would move at very slow speeds so as not to generate more noise than that already caused by other rail activity and aircraft in the area. It also noted that the known bald eagle nests within the investigated distance of the project site belong to a specific pair of birds and are on an island in the Delaware River. Ramboll opined it was therefore unlikely another breeding pair will settle within the Loop's actual footprint due to the species' territorial nature.

Ramboll also stated that ospreys, which prey on fish, prefer nest locations closer to water than the Loop's site. It explained DRP installed artificial nesting platforms for ospreys as part of its mitigation plan for the GLC as a whole, but that ospreys had not been observed using them in recent years. Ramboll suggested that this may be due to the nearby pair of eagles, "which are territorially dominant" and which had been observed perching on the nesting platforms. It said DRP would relocate two osprey nest platforms currently placed within the footprint of the Loop.

In addition, Ramboll's reports included a letter and data request results from the New Jersey Natural Heritage Program (NHP), which is operated by the Office of Natural Lands Management within DEP. Those results indicated a possibility of some additional threatened or endangered species being present in

the area of the Loop, based on "the known or expected range of each species." As relevant to the issues before us, these included the red knot, bog turtle, and sensitive joint-vetch. The NHP materials stated that the animals and plants on the list "are not guaranteed to be found on or near the project area" and that to "fully determine any potential effects to species, additional site-specific and project-specific information is often required."

Ramboll's reports explained that red knots, a species of migratory bird, are "not likely" to utilize the area of the Loop because they typically seek out "tidal mudflats and beaches" and not the "highly urbanized area of the Delaware River." Bog turtles, according to Ramboll, had "not been identified within one mile of" the project site. Sensitive joint-vetch, a flowering plant in the legume family, was "not observed during wetland delineation activities" and was also "not likely to be present" in the project area because it "occurs within intertidal marshes that are flooded twice daily in areas with high plant diversity"; the land to be disturbed by the Loop's construction has "not been tidally influenced for several decades" due to the tide gate and its main vegetation is a "dense, impenetrable" monoculture of phragmites, a common and invasive type of reed. Overall, Ramboll indicated that the project area is "characterized by invasive-dominated herbaceous communities," with only "limited tree and shrub species."

A-1897-21

The Ramboll report also stated that because the Loop will be a "major development" as defined in N.J.A.C. 7:8-1.2, it must comply with the Stormwater Management rules. It noted a Stormwater Management plan had been "developed and implemented" for the GLC previously, which was designed to meet the groundwater recharge and stormwater runoff quality standards as applicable.

DEP determined that DRP's application for the Permits was administratively complete on June 15, 2021, but it requested additional information concerning stormwater measures, impacts to vegetation in riparian areas, the amount of impervious surface that would be created, and possible impacts on endangered species, specifically bald eagles and ospreys. In response, DRP submitted supplemental reports by Ramboll on September 3 and 23, 2021.

Ramboll's additional analysis of the Loop's potential stormwater impacts indicated that the increase in stormwater runoff that would be created by the new railway was "statistically insignificant" compared to pre-existing site conditions. The report explained that the type of surface the railway would add is "[b]y necessity" composed of "permeable materials" that will "permit surface water to percolate to subsurface soils and contribute to groundwater flow."

12

Ramboll also explained in more detail that train activity along the Loop would be conducted at speeds not exceeding five miles per hour, which would minimize noise and other disruption to eagles and ospreys that might be in the area. It reiterated that ospreys had not been seen near the GLC recently, and that the bald eagle pair known to nest on the nearby island had been observed perching on the artificial osprey nest platforms DRP previously installed, which would deter ospreys from using them.

DEP published notice of the permit application and sought public comments from July 7 to August 7, 2021. No comments were submitted during this time period, but appellants sent two comments on October 12 and December 6, 2021.

The issues appellants raised in their comments are nearly identical to those before us, with the October 12 comment urging DEP not to issue permits to DRP until the federal government had ruled on its jurisdiction over the GLC, and the December 6 comment alleging that DRP had improperly segmented its applications for permits and had not included sufficient information about stormwater management or impacts to wetlands and wildlife.

Despite their belated filings, DEP and DRP nevertheless responded to appellants' comments. For its part, DRP made a third supplemental submission

13

on December 10, 2021, in which it showed the proposed locations of two additional osprey nest platforms and identified vegetated and unvegetated riparian zone disturbances on its site plans. It explained that these disturbances had been minimized to the greatest extent possible given that railroad tracks must be a standard width to accommodate trains and must utilize curves of sufficient radii to ensure safe travel. It further stated that the total area of vegetation to be removed did not exceed regulatory limits.

In its own answer, DEP noted most of appellants' arguments were related more to the prior permits issued for the Dock 1/GLC and Dock 2 projects rather than to the Loop and incorporated its previous response to appellants' assertions during the Dock 2 public comment period. DEP also drafted environmental reports for the Permits, addressing whether the Loop complied with relevant regulatory standards and found the Loop met the requirements for stormwater management.

DEP also discussed impacts to wetlands, riparian areas, and threatened and endangered species, explaining that these issues would be dealt with through permit conditions and/or mitigation plans. Further, DEP noted that in its application to construct the Loop, DRP addressed the energy facility and port aspects of the overall GLC project.

Specifically, DEP stated that the stormwater management system for the GLC had been approved in 2017 and that "management for the rail loop was also reviewed for compliance with the Stormwater Management rules." It further found that "[t]he overland flow of stormwater will not be impeded by the railroad loop." DEP concluded that "provided that DRP complies with the conditions specified in the permit," the Loop's construction would satisfy the rules.

As to the disturbance of riparian areas and wetlands, DEP found that DRP had demonstrated that the size of the impact is "the minimum necessary to meet the safety requirements for the construction of the railroad tracks." It stated that the wetland transition area that would be affected "consists of unvegetated, gravel or compacted soil road surfaces," and that therefore the Loop's construction "will not significantly change the characteristics of the transition area." DEP further found that because the Loop would be located on an existing access road, there would be "minimal impacts to freshwater wetlands and . . . coastal wetlands that are adjacent to the Delaware River." DEP's reports also set forth the conditions it would impose on the Permits, as will be discussed below.

In addition, DEP responded to appellants' claim it could not issue the Permits until FERC ruled on its jurisdiction and the Federal Pipeline and Hazardous Material Safety Administration (PHMSA) decided whether to continue allowing transport of LNG by rail. The DEP found that the NGA did not prevent it from exercising its authority under the Coastal Zone Management (CZM) Rules, N.J.A.C. 7:7-1.1 to -29.10, to grant or deny DRP's application while these federal issues were pending. It noted that if DRP wished to conduct a business of moving LNG by rail, it "must comply with all applicable federal requirements."

DEP also found DRP had not improperly "segmented" the GLC's development to circumvent review of the facility's overall environmental impacts, noting the Loop was required to meet individual freshwater wetlands permitting standards and stating that it had reviewed the cumulative impact of the GLC. It further stated that its review of impacts to endangered species took the entire GLC into consideration.

On December 30, 2021, DEP issued the combined Flood Hazard Area Permit, Waterfront Development Permit, Coastal Wetlands Permit, and Water Quality Certificate. These permits authorize the disturbance of 0.14 acres of riparian zone and 0.019 acres of coastal wetlands. To mitigate this disturbance,

16

the Permits require DRP to purchase credits from a local wetlands mitigation bank prior to commencing construction of the Loop. The Permits also place seasonal restrictions on construction to avoid interference with endangered osprey and bald eagle nesting activities and require that DRP relocate existing structures to support osprey nests in the area of the Loop.

On February 25, 2022, DEP issued the Freshwater Wetlands Permit, authorizing the disturbance of 0.0169 acres of freshwater wetlands and 4.132 acres of transition area surrounding those wetlands. The permit states that the wetlands affected are of "Intermediate resource value" and require "the standard transition area" of a "[fifty] feet buffer." It also includes a "transition area waiver" allowing "encroachment only in that portion of the transition area which has been determined by [DEP] to be necessary to accomplish" the Loop's construction and operation.

To alleviate the disturbance to the wetlands and transition area, DRP must purchase further mitigation bank credits. DRP must also install and maintain silt fence barriers around soils disturbed by the Loop's construction that are "sufficient to prevent the sedimentation of the wetlands, transition areas, and Delaware River" and protect these lands "from encroachment by construction

vehicles." This permit places the same seasonal restrictions on construction as the others.

The Permits contain a standard condition stating that DRP "shall obtain all applicable Federal, State, and local approvals prior to commencement" of the Loop's construction. DRP will also need to obtain approval of a Soil Erosion and Sediment Control Plan from the Gloucester County Soil Conservation District, and a New Jersey Pollution Discharge Elimination System (NJPDES) general stormwater permit. Appellants appealed both the December 30 and February 25 Permits, which we consolidated.

II.

As noted, before us, appellants argue the DEP acted arbitrarily, capriciously, and unreasonably in issuing the Permits. They specifically maintain: (1) DEP should have waited to issue them until after FERC issued a declaratory order regarding its possible jurisdiction over the GLC; (2) GLC's construction has been improperly "segmented" for purposes of seeking permits from DEP; (3) DRP failed to provide sufficient information about the potential stormwater impacts of the Loop; (4) DRP did not provide site-specific information demonstrating that the Loop will not harm coastal habitats; and (5) the Loop will cause unacceptable adverse impacts to threatened and endangered

species. After first addressing the appropriate standard of review, we detail the substantive law which necessarily informs our analysis. Next, we address, and reject, in sections II (A)-(E), each of these arguments, with reference in those sections to additional legal authority supporting our decision.

On appeal, the judicial capacity to review agency actions is "limited." Pub. Serv. Elec. & Gas Co. v. N.J. Dep't of Env't Prot., 101 N.J. 95, 103 (1985). An agency's "final quasi-judicial decision" should be affirmed unless there is a "'clear showing' that it is arbitrary, capricious, or unreasonable, or that it lacks fair support in the record." Circus Liquors, Inc. v. Governing Body of Middletown Twp., 199 N.J. 1, 9 (2009) (quoting In re Herrmann, 192 N.J. 19, 27-28 (2007)). We are restricted to three inquiries:

> (1) whether the agency action violates the enabling act's express or implied legislative policies; (2) whether there is substantial evidence in the record to support the findings upon which the agency based [its] application of legislative policies; and (3) whether, in applying the legislative policies to the facts, the agency clearly erred by reaching a conclusion that could not reasonably have been made upon a showing of the relevant factors.
>
> [Pub. Serv. Elec. & Gas, 101 N.J. at 103.]

"The interest of justice . . . authorizes a reviewing court to abandon its traditional deference . . . when an agency's decision is manifestly mistaken." Outland v. Bd. of Trs. of the Tchrs' Pension & Annuity Fund, 326 N.J. Super.

19

395, 400 (App. Div. 1999). Further, a court is "not bound by an agency's interpretation of a statute, if it is contrary to [the] legislative intent and plain meaning of the statute." Ibid.

Nevertheless, "[e]ven if a court may have reached a different result had it been the initial decision maker, it may not simply 'substitute its own judgment for the agency's.'" Circus Liquors, 199 N.J. at 10 (quoting In re Carter, 191 N.J. 474, 483 (2007)). The courts' "strong inclination" is to "defer to agency action that is consistent with the legislative grant of power." Lower Main St. Assocs. v. N.J. Hous. & Mortg. Fin. Agency, 114 N.J. 226, 236 (1989). This presumption that an agency's decision is reasonable "is even stronger when the agency has delegated discretion to determine the technical and special procedures to accomplish its task." In re Application of Holy Name Hosp. for a Certificate of Need, 301 N.J. Super. 282, 295 (App. Div. 1997). The Legislature's delegation of power to an agency is "construed liberally when the agency is concerned with the protection of the health and welfare of the public." Barone v. Dep't of Hum. Servs., 210 N.J. Super. 276, 285 (App. Div. 1986).

The courts also typically defer to an administrative agency's "technical expertise, its superior knowledge of its subject matter area, and its fact-finding role," Messick v. Bd. of Rev., 420 N.J. Super. 321, 325 (App. Div. 2011),

particularly concerning "technical matters which lie within its special competence." In re Application of Boardwalk Regency Corp. for a Casino License, 180 N.J. Super. 324, 333 (App. Div. 1981). The courts have specifically acknowledged the broad discretion granted to DEP "to determine the specialized and technical procedures for its tasks" "in regard to wetlands." In re Authorization for Freshwater Wetlands Gen. Permits, 372 N.J. Super. 578, 593 (App. Div. 2004). Moreover, while DEP's interpretation of scientific data is "not binding," it is "'entitled to substantial weight.'" Pinelands Pres. All. v. State, Dep't of Env't Prot., 436 N.J. Super. 510, 533 (App. Div. 2014) (quoting N.J. Chapter of Nat'l Ass'n of Indus. & Off. Parks v. N.J. Dept. of Env't Prot., 241 N.J. Super. 145, 165 (App. Div. 1990)). "This is particularly true when the matter involves complex scientific methodologies." Ibid.

In 1973, the Legislature enacted the Coastal Area Facility Review Act (CAFRA), N.J.S.A. 13:19-1 to -21, "to protect the unique and fragile coastal zones of the State." In re Egg Harbor Assocs. (Bayshore Centre), 94 N.J. 358, 364 (1983). CAFRA mandates that any proposed development within a "coastal area" that meets certain construction and development thresholds must obtain a permit or permits from DEP before commencing construction, unless it is otherwise expressly exempted. In re Protest of Coastal Permit Program Rules,

354 N.J. Super. 293, 310 (App. Div. 2002) (citing N.J.S.A. 13:19-5, -5.2, and -5.3). The Legislature also delegated DEP the power to promulgate regulations "to effectuate the purposes of" CAFRA. N.J.S.A. 13:19-17(a).

CWA was enacted in 1970 to "preserve the ecological balance" of coastal wetlands areas and prevent their deterioration by "regulating the dredging, filling, removing or otherwise altering or polluting thereof." N.J.S.A. 13:9A-1. This statute covers "any bank, marsh, swamp, meadow, flat or other low land subject to tidal action" along the various rivers, bays, and other waterways in the state. N.J.S.A. 13:9A-2. Any party proposing to drain, dredge, excavate or remove soil, dump rubbish or discharge liquid wastes, or erect any structures upon wetlands must first obtain a permit from DEP. N.J.S.A. 13:9A-4.

DEP executes its authority under CAFRA and CWA through the CZM Rules. Coastal Permit Program Rules, 354 N.J. Super. at 312. These regulations contain "the procedures for reviewing coastal permit applications and enforcing violations," and "the substantive standards for determining development acceptability and the environmental impact of projects for which coastal permits are submitted." Ibid. The CZM Rules "are founded on . . . broad coastal goals," including protecting "healthy coastal ecosystems" and "safe, healthy and well-planned coastal communities and regions"; promoting "effective management of

22

ocean and estuarine resources"; "sustain[ing] and revitaliz[ing] water-dependent uses" such as ports and other waterfront sites, and coordinating coastal decision-making, planning, research, education, and outreach.  N.J.A.C. 7:7-1.1(c).  They cover the issuance of CAFRA Permits, Coastal Wetlands and Waterfront Development Permits, and of Water Quality Certificates for projects subject to the Federal Clean Water Act, 33 U.S.C. § 1341.  N.J.A.C. 7:7-1.1(a).

While CWA covers only wetlands near waterways, FWPA, enacted in 1987, covers all areas that are "inundated or saturated by surface water or groundwater at a frequency and duration sufficient to support . . . a prevalence of vegetation typically adapted for life in saturated soil conditions."  N.J.S.A. 13:9B-3.  In FWPA, the Legislature found that it is "in the public interest to establish a program for the systematic review of activities in and around freshwater wetland areas" in the state, "to preserve the purity and integrity" of such lands "from random, unnecessary or undesirable alteration or disturbance." N.J.S.A. 13:9B-2.  To that end, FWPA requires a permit for "regulated activity" in a freshwater wetland area, including "[t]he removal, excavation, disturbance or dredging of soil, sand, gravel, or aggregate material of any kind," dumping, discharging or filling a wetland area with any materials, and "[t]he destruction of plant life which would alter the character of a freshwater wetland, including

23

the cutting of trees." N.J.S.A. 13:9B-3; N.J.S.A. 13:9B-9. FWPA sets forth requirements for applicants and the process for DEP to review applications. N.J.S.A. 13:9B-5; N.J.S.A. 13:9B-9 to -11; N.J.S.A. 13:9B-23. DEP carries out its statutory mandate through the FWPA rules, N.J.A.C. 7:7A-1.1 to -22.20.

FHACA was enacted in 1962 to empower DEP to take action related to flooding and flood preparation within the state. N.J.S.A. 58:16A-50. Under this statute, DEP enjoys "broad authority" to "map flood hazard areas, adopt land regulations, control stream encroachments, coordinate the development, dissemination, and use of relevant information and integrate the control activities of municipal, county, state and federal governments." Am. Cyanamid Co. v. State, Dept. of Env't Prot., 231 N.J. Super. 292, 297 (App. Div. 1989). More specifically, N.J.S.A. 58:16A-52(a) provides that DEP must "adopt rules and regulations which delineate as flood hazard areas such areas as, in the judgment of the department, the improper development and use of which would constitute a threat to the safety, health, and general welfare from flooding." FHACA authorizes DEP to regulate the development and use of such delineated areas "to minimize the threat to the public safety, health and general welfare" from flooding. N.J.S.A. 58:16A-55(a). DEP has promulgated the FHACA rules, N.J.A.C. 7:13-1.1 to -24.11, to carry out its statutory mandate.

24

DEP has also promulgated the Stormwater Management Rules to "establish[] general requirements for stormwater management plans and stormwater control ordinances" and "design and performance standards for stormwater management measures required by rules pursuant to" FHACA, CAFRA, FWPA, and other environment-related statutes.  N.J.A.C. 7:8-1.1.

Addressing appellants' arguments requires the interpretation of several provisions of these statutes and rules.  Courts interpret statutes and regulations in the same way.  In re Eastwick Coll. LPN-to-RN Bridge Program, 225 N.J. 533, 542 (2016).  The "'paramount goal' is to determine the drafter's intent," which is generally found in the enactment's "actual language."  Ibid. (quoting U.S. Bank, N.A. v. Hough, 210 N.J. 187, 199 (2012)).  Generally, words should be given "their ordinary and commonsense meaning."  In re Election L. Enf't Comm'n Advisory Op. No. 01-2008, 201 N.J. 254, 263 (2010).

A court should view a law's words in the context of the entire regulatory scheme of which it is a part.  Ibid.  It must make every effort "to avoid rendering any part . . . superfluous."  State in Int. of K.O., 217 N.J. 83, 91 (2014).  The court must "presume that every word . . . has meaning and is not mere surplusage," and "must give those words effect and not render them a nullity."  In re Att'y Gen.'s "Directive on Exit Polling:  Media & Non-Partisan Pub. Int.

Grps.", 200 N.J. 283, 297-98 (2009). Further, a court must not "rearrange the wording of the regulation, if it is otherwise unambiguous, or engage in conjecture that will subvert its plain meaning." U.S. Bank, 210 N.J. at 199. It "cannot insert qualifications into a statute or regulation that are not evident" from that language. Id. at 202.

While a court is not bound by the agency's reading of a statute or its decision on a strictly legal issue, U.S. Bank, 210 N.J. at 200, the courts do defer to an agency's interpretation of a regulation "within the sphere of its authority" unless the interpretation is "plainly unreasonable." Election L. Enf't Comm'n, 201 N.J. at 262. This is because "a state agency brings experience and specialized knowledge to its task of administering and regulating a legislative enactment within its field of expertise." Ibid. It is assumed that "the agency that drafted and promulgated the rule should know the meaning of that rule." In re Freshwater Wetlands Gen. Permit No. 16, 379 N.J. Super. 331, 341-42 (App. Div. 2005) (quoting Essex Cnty. Bd. of Tax'n v. Twp. of Caldwell, 21 N.J. Tax 188, 197 (App. Div. 2003)).

A. Absence of FERC Declaratory Judgment

Appellants argue DEP wrongfully approved the Permits before FERC issued a declaratory judgment concerning its jurisdiction over the GLC. They

concede that DEP "correctly noted" that its own authority under the CAFRA and the CZM rules "would not be preempted" if FERC does decide it has jurisdiction. Nevertheless, they assert that the Permits for the Loop, which will "support the LNG transloading operations at the GLC," should not have been granted before the "outstanding jurisdictional issue" is resolved.

Appellants also argue that the Permits should not have been issued because in November 2021, PHMSA published notice of a proposed suspension of regulations authorizing transportation of LNG by rail. They contend that DEP's approval of the Permits for the Loop was "premature" because the federal government may decide in the future to ban one of the activities for which DRP plans to use the new railway. We are unpersuaded by these arguments.

Under the NGA, "no person shall export any natural gas from the United States to a foreign country or import any natural gas from a foreign country without first having secured an order of [FERC] authorizing it to do so." 15 U.S.C. § 717b(a). Anyone wishing to engage in such activity must file an application with FERC, which must provide the applicant with a hearing and determine whether the proposed exportation or importation is "consistent with the public interest." Ibid. FERC has "exclusive authority to approve or deny an application for the siting, construction, expansion, or operation of an LNG

A-1897-21

terminal." 15 U.S.C. § 717b(e)(1). The term "LNG terminal" includes natural gas facilities found onshore or in State waters "that are used to receive, unload, load, store, transport, gasify, liquefy, or process natural gas" that is imported, exported, or transported interstate by waterborne vessel. 15 U.S.C. § 717a(11).

15 U.S.C. § 717b(d) provides that except as specifically stated, nothing in the NGA affects the rights of states under the Coastal Zone Management Act of 1972, 16 U.S.C. §§ 1451-1468, the Clean Air Act, 42 U.S.C. §§ 7401-7438, or the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251-1389, which includes the Clean Water Act, 33 U.S.C. §§ 1341.[1]

CAFRA states that the rules DEP is authorized to adopt under that statute must be "closely coordinated with the provisions of" the Federal Coastal Zone Management Act. N.J.S.A. 13:19-17(b). The CZM rules themselves contain "enforceable policies of the New Jersey Coastal Management Program as approved under" the federal Act and are used to review "Federal consistency determinations" under the same. N.J.A.C. 7:7-1.1(a) and (c). The CZM rules are also used in the review of Water Quality Certificates subject to the Clean Water Act. N.J.A.C. 7:7-1.1(a). As a result, the Waterfront Development Permit, Coastal Wetlands Permit, and Water Quality Certificate here, which

---

[1] See In re Freshwater Wetlands Prot. Act Rules, 180 N.J. 415, 419 (2004).

were granted pursuant to the CZM rules, were issued as part of DEP's retained authority under the Coastal Zone Management Act and Clean Water Act.

The Federal Clean Water Act generally requires parties wishing to discharge dredged or fill material into wetlands to seek a permit from the United States Army Corps of Engineers, but also "specifically allows states to assume permitting authority for waters within their jurisdictions so long as the state program is at least as stringent as the federal [one]." Freshwater Wetlands Prot. Act Rules, 180 N.J. at 422. Through FWPA, DEP has assumed this authority. Ibid.; N.J.S.A. 13:9B-27. Thus, the NGA does not affect the New Jersey agency's right to issue a Freshwater Wetlands Permit. Del. Riverkeeper Network v. Sec'y Pa. Dep't of Env't Prot., 833 F.3d 360, 368-69 (3rd Cir. 2016). The Third Circuit has found that because FWPA requires compliance with FHACA under N.J.A.C. 7:7A-10.2(b)(10), a Flood Hazard Area Permit also falls under DEP's retained authority under the Clean Water Act. Id. at 373.

Because DEP granted all the permits at issue in this case pursuant to the State's rights under one or more of the statutes enumerated in 15 U.S.C. § 717b(d), FERC's otherwise exclusive authority to act concerning LNG facilities does not apply. Further, nothing in the various permitting statutes and regulations makes issuance of state-level permits for a railway loop contingent

29

upon an applicant first gaining FERC's siting approval for the LNG terminal the Loop serves. Stated differently, while ultimately DRP is required to obtain siting approval for the GLC from FERC under 15 U.S.C. § 717b, DEP was not required to await FERC's determination before granting the state-level Permits. Indeed, the Permits state that DRP must obtain all relevant federal approvals before beginning construction of the Loop.

We note in general, if DEP fails to act on a construction permit application within ninety days, that application "shall be deemed to have been approved" under N.J.S.A. 13:1D-32. The FHACA rules echo this hard deadline for action. N.J.A.C. 7:13-21.3(c). CAFRA sets forth an even tighter timeline for permits sought under that statute, after which an application will be "deemed to have been approved"; DEP must decide within sixty days of a hearing or the close of a comment period concerning an application, or within ninety days following receipt of any requested additional information. N.J.S.A. 13:19-9; N.J.A.C. 7:7-26.6(f). By contrast, under FWPA, DEP must issue or deny a permit within ninety days, but the application is not deemed approved if it does not do so. N.J.A.C. 7:7A-19.7.

Because of these deadlines, DEP was obligated to act to grant or deny DRP's permit applications even though, as it turned out, FERC did not make its

own ruling before the time limits expired. Had DEP failed to do so, all of the permits, with the exception of the Freshwater Wetlands Permit, would have been "deemed approved" as requested, without allowing the agency the opportunity to impose any but the standard conditions upon them. In such an event, DEP could not have, for example, limited DRP's construction activities to protect bald eagles and ospreys, creating a situation less beneficial to the environment than what had actually occurred. As a result, we are satisfied that waiting for FERC would have been both unnecessary under the relevant regulatory scheme and imprudent under the circumstances.

We also reject appellants' argument DEP should not have acted until PHMSA decides whether to continue allowing rail transport of LNG. Nothing in any of the governing provisions indicates that DEP must delay its permitting decisions pending federal action that might affect a particular applicant's project. There is no way to know when PHMSA will reach its decision, or what that decision will be. In the meantime, DEP was obligated to comply with the timelines for reviewing the various construction permits, regardless of any speculation about possible future action by the federal government.

B. Segmentation of the GLC's Development

A-1897-21

Appellants also contend DRP has improperly "segmented" the development of the GLC by submitting "three individual sets of applications" for various permits to date, in violation of N.J.A.C. 7:7A-10.1(c). They assert that DRP knew that the GLC's operations would involve using trains to transport LNG from its planning stages, and that therefore it should have applied for permits to create a new railway at the same time as it requested permits to build the rest of the facility's structures. Appellants contend that DRP "must not be allowed to proceed through the regulatory process in such a piecemeal fashion," arguing that DEP acted arbitrarily, capriciously, and unreasonably by "incrementally reviewing and approving DRP's applications for different portions of the same project." We are unpersuaded by these arguments.

Under CAFRA and the CZM rules, N.J.S.A. 13:19-5 and N.J.A.C. 7:7-8.1, and FWPA, N.J.A.C. 7:7A-10.2, a person or entity must seek an "individual" permit before undertaking certain types of construction in coastal and wetlands areas. These permits are "project-related and are required for activities that will have substantial . . . impacts." Freshwater Wetlands Prot. Act Rules, 180 N.J. at 422-23. The statutes also allow the issuance of "general" permits, which are "designed to streamline the permitting process for certain activities that have only a minimal impact, individually and cumulatively, on the

32                                                                    A-1897-21

environment." Id. at 423. As relevant here, a Freshwater Wetlands General Permit may be granted where activity "would not result in the loss or substantial modification of more than one acre of freshwater wetland." N.J.S.A. 13:9B-23(b); N.J.A.C. 7:7A-5.3 and -5.4. Otherwise, an individual permit is needed.

The FWPA rules provide that the one-acre limit on disturbance in a general permit applies to "the entire site upon which activities authorized under" that permit occur. N.J.A.C. 7:7A-5.3(f). An applicant may not "segment a project or its impacts" by seeking a general permit for one portion of the project and an individual permit for another part or by separately applying for multiple general permits "for different portions of the same project." Ibid. The rules similarly state that all limitations on regulated activity placed upon individual permits apply to "the entire site." N.J.A.C. 7:7A-10.1(c).

Applicants may not segment projects by "separately applying for individual permits for different portions of the same project." Ibid. For example, an applicant whose overall construction project might disrupt a large area of wetlands cannot avoid the environmental impact requirements for individual FWPA permits set forth in N.J.A.C. 7:7A-10.2(b) by dividing the project into multiple smaller areas whose disturbances might appear negligible if viewed separately.

Here, DRP's application indicated that it was seeking individual permits under each of the relevant statutes and regulations. This was necessary because "[u]nder previous FWPA permits issued for the site, the cumulative total wetland impacts are greater than one acre." The Loop in itself will disturb only 0.0169 acres of freshwater wetlands. Because DRP's application referenced the "cumulative" impacts to wetlands, including those under "previous" permits which together exceed the one-acre general permit limit, we are satisfied DRP did not intend to obscure the overall effect on the environment of the greater GLC project by segmenting its construction.

Our conclusion is fully supported by the record, including the environmental impact statements by Ramboll, which analyzed not only the discrete project site for the Loop but a wider swathe of the area surrounding the GLC. For example, the reports discussed a pair of bald eagles nesting on an island in the Delaware River. DEP's response to appellants' comments stated that it reviewed DRP's application "under the individual permit requirements including an alternatives analysis to minimize impacts to freshwater wetlands for the entire project and including mitigation for all impacts associated with the project and overall site." Thus, DRP's GLC-related applications over the years have not resulted in "piecemeal" review by DEP as appellants claim.

A-1897-21

Instead, it appears that DRP initially proposed building the GLC and then subsequently determined that a railway loop would improve the facility's efficiency, similarly to how it decided a second dock would be beneficial. Nothing in the various statutes and regulations prohibits an entity wishing to undertake construction in a protected area from broadening its plans. The provisions simply prevent an applicant from escaping review of the total impact of those expanded activities. We are therefore satisfied DEP did not act arbitrarily, capriciously, or unreasonably by approving the Permits, as there has been no improper segmentation of the GLC's construction.

## C. Stormwater Impacts

Appellants next contend DEP wrongfully issued the Permits because DRP did not provide site-specific information about the Loop's potential stormwater impacts. They argue that the Loop is a "major development" under N.J.A.C. 7:8-1.2, and thus needed to comply with the Stormwater Management rules. Appellants argue that it does not, contending that the Loop was "plainly unaccounted for in DRP's initial Stormwater Management Plan" for the GLC and that DRP provided only a "cursory" statement of compliance. Appellants also contend that DRP did not address "the potential leaking of fuel or refrigerant from the train equipment itself, as well as the risk of spills and cargo

leaks" and whether polluted stormwater "would be recharged at the project site." Again, we disagree.

The CZM rules provide that "[i]f a project or activity meets the definition of 'major development' at N.J.A.C. 7:8-1.2, then [it] shall comply with the Stormwater Management rules at N.J.A.C. 7:8." N.J.A.C. 7:7-16.6(a). Compliance is "appropriate" because "development and land use activities contribute greatly to the types and amount of pollutants that are found in stormwater runoff," and the rules "provide minimum Statewide runoff techniques, as well as special protection measures for environmentally sensitive water and land areas." N.J.A.C. 7:6-16.6(b).

Under N.J.A.C. 7:8-1.2, a "major development" is "any development that provides for ultimately disturbing one or more acres of land or increasing impervious surface by one-quarter acre or more." "Disturbance" means "the placement of impervious surface or exposure and/or movement of soil or bedrock or clearing, cutting, or removing of vegetation." Ibid. "Impervious surface" means "a surface that has been covered with a layer of material so that it is highly resistant to infiltration by water." Ibid. Because the Loop's construction will involve the disturbance of more than one acre of freshwater wetlands and transition areas, it meets this definition.

The Stormwater Management rules establish "standards for limiting 'the adverse impact of stormwater runoff,'" as well as "[s]tandards for controlling erosion, encouraging and controlling infiltration and groundwater recharge, and controlling runoff quantities" and quality. In re Authorization for Freshwater Wetlands Statewide Gen. Permit 6, Special Activity Transition Area Waiver, 433 N.J. Super. 385, 409 (App. Div. 2013) (quoting N.J.A.C. 7:8-5.1(a)). Stormwater management plans developed by parties seeking DEP construction permits "shall be designed to," among other goals, minimize increases in stormwater runoff, reduce soil erosion, maintain groundwater recharge,[2] and minimize pollutants in stormwater runoff. N.J.A.C. 7:8-2.2. Plans must also "avoid adverse impacts of concentrated flow on habitat for threatened and endangered species." N.J.A.C. 7:8-5.2(c).

N.J.A.C. 7:8-5.2(f) sets forth detailed "best management practices" for achieving the recharge and runoff quality and quantity standards set forth in N.J.A.C. 7:8-5.4, -5.5, and -5.6. N.J.A.C. 7:8-5.5 and -5.6, in turn, provide tables showing how runoff quality and quantity should be analyzed and

[2] "Recharge" means "the amount of water from precipitation that infiltrates into the ground and is not evapotranspired." N.J.A.C. 7:8-1.2. In other words, a stormwater management plan must seek to ensure that groundwater is replenished so that, for example, freshwater wetlands do not become too dry.

A-1897-21

calculated to determine whether standards are met. For example, N.J.A.C. 7:8-5.6(b) states that an applicant must "[d]emonstrate through hydrologic and hydraulic analysis" that the proposed construction will not increase "the peak runoff rates of stormwater leaving the site for the two-, [ten]-, and [one hundred]-year storm events," and must design stormwater management measures so that post-construction peak runoff rates for these storm events are "[fifty], [seventy-five], and [eighty] percent, respectively, of the pre-construction peak runoff rates." Under N.J.A.C. 7:8-5.5(b), stormwater management plans must also be "designed to reduce the post-construction load of total suspended solids (TSS) in stormwater runoff." However, this requirement does not apply to stormwater runoff otherwise regulated "under a numeric effluent limitation for TSS imposed under the [NJPDES] rules[3] . . . or in a discharge specifically exempt under a NJPDES permit." N.J.A.C. 7:8-5.5(c).

Here, as part of the Dock 1/GLC permitting process, DRP was required to show compliance with the Stormwater Management rules by designing a stormwater management system for the facility. DEP concluded that DRP's plan satisfied the relevant standards when issuing those initial permits. For the Loop,

---

[3] N.J.A.C. 7:14A-1.1 to -25.10.

the Ramboll report DRP submitted with its application stated that the general stormwater management plan for the GLC would be sufficient to also meet the groundwater recharge and stormwater runoff quality standards set forth in the Stormwater Management rules.

The supplemental Ramboll report DRP provided in response to DEP's inquiry provided more information and the results of the consultant's hydraulic and hydrologic analyses; it stated that the new railway would only increase stormwater runoff by a "statistically insignificant" amount compared to pre-construction conditions. The report further explained that groundwater recharge would not be impeded, because the Loop would be constructed of permeable materials that would allow water to enter the soil below. Ramboll's report gave the methodology used to reach these conclusions, which addressed both the entire GLC site and the area of the Loop. DEP reviewed these materials and found that "[t]he overland flow of stormwater will not be impeded by the railroad loop."

Based on the record, we are satisfied DEP did not act arbitrarily, capriciously, or unreasonably in determining that the DRP's application for the Loop complied with the Stormwater Management rules, as its conclusion was

39

based on substantial evidence.[4]  Pub. Serv. Elec. & Gas, 101 N.J. at 103. Although DRP's prior stormwater management plan did not necessarily take the construction of a railway into consideration, the record indicates that the Loop will not impact runoff or recharge to a degree where a new or expanded plan is necessary.  Particularly because DEP is entitled to deference concerning its interpretation of scientific data, Pinelands Preservation Alliance, 436 N.J. Super. at 533, we discern no error in its failure to require DRP to submit a new or updated stormwater management plan in connection with the Loop.[5]

D.  Site-Specific Information on Coastal Habitat Impacts

Appellants next contend DEP should not have issued the Permits because DRP failed to provide site-specific information demonstrating compliance with the CZM, FHACA, and FWPA rules.  Specifically, they assert that the Loop

---

[4]  Appellants have also asserted that DRP failed to comply with the CZM rules and FWPA to the extent that these incorporate the Stormwater Management rules.  Because we have concluded that DRP's application properly addressed stormwater management requirements, we reject this argument.

[5]  Further, appellants' arguments concerning potential pollutant spills from rail cars or cargo appear inapposite.  N.J.A.C. 7:8-5.5(c) indicates that requirements to reduce TSS in stormwater runoff do not apply where the issue is pollutants regulated under NJPDES.  The Permits from which appellants appeal state that DRP must also obtain an NJPDES general stormwater permit before constructing the Loop.  We presume the potential impacts from fuel or refrigerant leaking from trains, as appellants describe, will be considered and addressed in relation to that permit application.

A-1897-21

constitutes an "energy facility" under the CZM rules, because the trains running thereon will "plainly be temporarily storing and distributing fossil fuels." As a result, they argue, under N.J.A.C. 7:7-15.4(b)(1) the Loop "may not be sited in special areas or marine fish and fisheries areas" unless DRP provides site-specific information that it will not result in adverse impacts to those areas.

Appellants further argue that DRP did not provide sufficient information about whether the storage and distribution of LNG that will be facilitated by the Loop is "compatible with or adequately buffered from surrounding uses" under N.J.A.C. 7:7-15.4(p)(2). They again reference the fact that PHMSA has proposed suspension of its regulations allowing transport of LNG by rail as evidence that the Permits should not have been approved, asserting that this possible federal action means that this activity is too dangerous.

Appellants contend that DRP's statement that fishery resources would not be adversely affected by the Loop was insufficient because it did not address potential impacts to fish other than threatened and endangered species. They also assert that creation of the Loop will disturb a ditch system, causing "perilous" impacts on "wildlife, including marine fish." Appellants also argue that DRP's application lacked site-specific information about "erosion and sedimentation controls" and possible effects on water quality in the area

41

pursuant to the FHACA rules. In particular, appellants express concern that sturgeon may be impacted by "excess siltation" resulting from construction of the Loop. We are unpersuaded by these contentions.

Initially, we conclude the Loop is not an "energy facility" under the CZM rules and is thus not subject to the regulations governing such facilities. N.J.A.C. 7:7-15.4(a) states that the term "energy facility" includes "facilities, plants or operations for the production, conversion, exploration, development, distribution, extraction, processing, or storage of energy or fossil fuels," as well as "onshore support bases and marine terminals." N.J.A.C. 7:7-15.4(b) and (c) set forth general standards regarding the siting of new energy facilities, and subsections (d) through (s) state specific standards and siting rules for various types of facilities.

The Loop does not in itself fit into any of the sixteen categories set forth in N.J.A.C. 7:7-15.4. The regulation does not reference new railways built to service facilities that have already been granted permits under the requirements of the relevant subsection(s), nor does it mention trains carrying liquid energy products. The Loop includes no storage tanks or other apparatus for holding energy products other than the trains, which are not a fixed part of the project's construction. None of the other activities discussed in N.J.A.C. 7:7-15.4(d)

42

through (s) will take place upon it. Further, DEP already evaluated the GLC using the appropriate standards for its type of energy facility. Appellants' argument that the Loop is an energy facility is similar to its prior assertions regarding Dock 2, which we rejected. In re Challenge of Del. Riverkeeper Network, slip op. at 21-22.

Because the Loop is not an energy facility, DRP did not need to provide "site-specific information" demonstrating that it would not adversely impact "marine fish and fisheries areas" under N.J.A.C. 7:7-15.4(b)(1) or to demonstrate that the railway is "compatible with or adequately buffered from surrounding uses" under N.J.A.C. 7:7-15.4(p)(2) as appellants argue. We also observe appellants appear to direct their complaints on this point more toward the LNG-related activities to be conducted at the GLC generally than to the construction or operation of the Loop itself. The time to raise these concerns was when the Dock 1/GLC permits were granted in 2017.

We also consider appellants' argument concerning a lack of specific information about "erosion and sedimentation controls" to be irrelevant. Standards for such controls are set forth in the Soil Erosion and Sediment Control Act, N.J.S.A. 4:24-39 to -55, and are administered by the State Soil Conservation Committee and local Soil Conservation Districts through

43

regulations at N.J.A.C. 2:90-1.1 to -4.18. Approval of an application for development of any "project," as defined in N.J.S.A. 4:24-41(g), is "conditioned upon certification by the local district of a plan for soil erosion and sediment control." N.J.S.A. 4:24-43, -44. The Permits at issue here state that DRP must obtain approval of such a plan from the Gloucester County Soil Conservation District. We presume information regarding these topics will be presented by DRP in its application for that approval, which is not currently before us.

Finally, DRP provided significant information concerning potential impacts to marine life and fisheries. On this issue, the CZM rules provide that "[a]ny activity that would adversely impact the natural functioning of marine fish, including the reproductive, spawning and migratory patterns or species abundance or diversity of marine fish, is discouraged." N.J.A.C. 7:7-16.2(b). Activity "that would adversely impact any New Jersey based marine fisheries or access thereto" is also discouraged. Ibid. The FHACA rules similarly state that DEP may only issue a permit if it determines that this "is not likely to cause significant and adverse effects" on "fishery resources." N.J.A.C. 7:13-12.1(b).

Here, DRP provided in its application, through the Ramboll reports, that although the area of the Delaware River near the GLC is a known habitat for endangered sturgeon, there are unlikely to be any fish whatsoever in the onshore,

upland area to be used for the Loop. As the Ramboll report explained, the "physical limitations" of the area, such as a tide gate, block fish from entering the Sand Ditch Settling Basin on the affected plot of land. It further stated that the ditch would be a "poor habitat" for any fish somehow managing to get into it, due to "limited food source[s]" and "predator influences."

Further, such fish would almost certainly not include the Atlantic sturgeon that are of particular concern here, since the species grows to be on average six to eight feet long and thus could not infiltrate beyond the tide gate.[6] As to the effects of siltation upon fish in the Delaware River, the Permits require DRP to install silt fence barriers while assembling the Loop, to ensure that excess material will not enter the surrounding wetlands or the river. The Loop will also be constructed upon an existing roadway/former railway to minimize soil disturbances, and it is unlikely that fish will be harmed by the construction or operation of the Loop.

In sum, we are satisfied DEP did not act arbitrarily, capriciously, or unreasonably by not applying the requirements for energy facilities when reviewing the Loop. In any event, we conclude DRP provided sufficient site-

---

[6] See Atlantic Sturgeon, https://en.wikipedia.org/wiki/Atlantic_sturgeon (last visited November 8, 2023).

specific information about the Loop's potential impacts on fish and fishery resources.

E.  Harm to Endangered Species

Appellants next contend DEP acted arbitrarily, capriciously, and unreasonably by issuing the Permits because the Loop will have "unacceptable adverse impacts" on threatened and endangered species.  Specifically, they assert that DRP's application did not include sufficient information about impacts to endangered bald eagles, ospreys, and sturgeon, to threatened red knots, bog turtles, and sensitive joint-vetch, and to "species of special concern" like the Fowler's toad, eastern box turtle, and Atlantic Coast leopard frog, which they assert may be present in the area of the Loop.  Appellants argue construction of the Loop will require removing vegetation in which animal species live and forage.  They also argue that DRP should not be allowed to purchase wetland mitigation bank credits in lieu of conducting onsite mitigation.

Appellants further assert that DRP's construction plans do not include large enough "transition areas" between the project area and wetlands that they contend are of "exceptional resource value" under FWPA and its rules.  They argue that the Loop does not qualify for a waiver of the standard transition area

widths set forth in that regulation. We conclude these arguments are without merit.

<u>General Environmental Concerns</u>

An application for a permit under CAFRA must include "an environmental impact statement which shall provide the information needed to evaluate the effects of a proposed development upon the environment of the coastal area." N.J.S.A. 13:19-6. DEP may only issue a permit if it finds that the proposed development, among other things, will "cause minimal feasible interference with the natural functioning of plant, animal, fish, and human life processes at the site and within the surrounding region." N.J.S.A. 13:19-10. It may deny an application if a project does not meet relevant standards, or may impose any conditions it finds "reasonably necessary to promote the public health, safety and welfare, to protect public and private property, wildlife and marine fisheries, and to preserve, protect and enhance the natural environment." <u>Ibid.</u> CWA also requires that before issuing a Coastal Wetlands permit, DEP must "consider the effect of the proposed work with reference to the public health and welfare, marine fisheries, shell fisheries, [and] wildlife . . . ." N.J.S.A. 13:9A-4(d).

The CZM rules more specifically limit development in "endangered or threatened wildlife or plant species habitat," defined as terrestrial and aquatic

areas "known to be inhabited on a seasonal or permanent basis by or to be critical at any stage in the life cycle of any wildlife or plant identified as 'endangered' or 'threatened' species on official Federal or State lists."  N.J.A.C. 7:7-9.36(a).  Such development is prohibited "unless it can be demonstrated, through an endangered or threatened wildlife or plant species impact assessment . . . that endangered or threatened wildlife or plant species habitat would not directly or through secondary impacts on the relevant site or in the surrounding area be adversely affected."  N.J.A.C. 7:7-9.36(b).

An applicant for a FWPA permit must also include a statement describing "any potential adverse environmental effects of the regulated activity and any measures necessary to mitigate those effects."  N.J.S.A. 13:9B-9(a)(4).  A Freshwater Wetlands Permit may only be issued if DEP finds that the proposed activity "[w]ill result in minimum feasible alteration or impairment of the aquatic ecosystem" and "[w]ill not jeopardize the continued existence of [threatened or endangered] species."  N.J.S.A. 13:9B-9(b).  FWPA defines "threatened or endangered species" as those species identified in the Endangered and Nongame Species Conservation Act, N.J.S.A. 23:2A-1 to -15, or which appear on the federal endangered species list.  N.J.S.A. 13:9B-7(d).

A Flood Hazard Area Permit may also be issued only if the proposed activity "will not destroy, jeopardize, or adversely modify a present or documented habitat for threatened or endangered species." N.J.A.C. 7:13-11.6(d). For activity that is "likely" to disturb "an area known to contain a threatened or endangered species," or a "habitat that could support a threatened or endangered species," an applicant must submit "a survey and/or a habitat assessment." N.J.A.C. 7:13-11.6(e). Through permit conditions, DEP must "restrict" activity during times when a covered species is "especially sensitive to disturbance," such as during nesting or migration. N.J.A.C. 7:13-11.6(g).

The FHACA rules further require that the "[c]learing, cutting, and/or removal of riparian zone vegetation" be "minimized" by applicants conducting regulated activities in a flood hazard area. N.J.A.C. 7:13-11.2(b)(2). Methods for minimization include "[l]imiting construction to actively disturbed areas and/or areas wherein the benefits and functions of a riparian zone are considerably deteriorated and impair as a result of previous development." Ibid. Examples of such areas are "[e]roded embankments," "[a]reas of dirt and gravel that are primarily devoid of vegetation," and "[a]bandoned pavement that has partially revegetated." Ibid.

A-1897-21

Against these legal principles, we are satisfied DRP included sufficient information in the report upon which DEP properly relied about potential impacts to threatened and endangered species. Indeed, DRP supported its environmental impact statement with the initial and supplemental Ramboll reports, which discussed the three endangered species known to use habitat within one-fourth of a mile of the Loop's project site—sturgeon, bald eagles, and ospreys—in detail. Ramboll stated that sturgeon live in the Delaware River and were unlikely to be present in the upland Loop area as discussed in the previous point. It explained that the bald eagle nests in the area all belong to one pair of birds and are located on an island some distance from the Loop, and that the trains to be used would not disturb these eagles because they would not generate more noise than is already present due to other railway and airplane travel through the area.

Further, Ramboll stated, and DEP agreed, that bald eagles are highly territorial and that the presence of the breeding pair in the vicinity is a deterrent to any further eagles or ospreys using the land around the Loop for nesting. Ramboll also noted that despite this, DRP had installed nesting platforms for ospreys during the GLC's construction and would relocate those installed near the Loop's intended site away from where trains might disturb any birds that

50

might use them in the future. As required by FHACA, the Permits placed seasonal restrictions on construction to avoid disrupting eagle and osprey nesting times.

As to the additional species to which appellants raise concerns, the NHP letter DRP included in its application indicated that the Loop was located within "the known or expected range of" red knots, bog turtles, and sensitive joint-vetch, but did not state definitively that these animals and plants were actually present on the land to be affected. And, addressing this point, Ramboll's reports provided detailed explanations why these species were unlikely to be found near the Loop, and stated that they had not been observed during wetland delineation activities in preparation for the application. In particular, because the project site is tidally locked and its vegetation is dominated by dense, invasive reeds, it cannot support the growth of joint-vetch and would not provide good habitat for red knots, which prefer tidal mudflats and beaches, or bog turtles, which require wetter conditions. The area is also not "known to be inhabited on a seasonal or permanent basis by" Fowler's toads, eastern box turtles, or Atlantic Coast leopard frogs. N.J.A.C. 7:7-9.36(a).

In sum, we again are fully satisfied DEP adequately considered the information provided and reached a conclusion concerning endangered and

threatened species that was amply and appropriately supported by the record. DRP demonstrated that the Loop will not jeopardize the existence of any protected species and will not disturb any activity by those species in the area to a prohibited degree under CAFRA, CWA, and the CZM, FWPA, and FHACA rules.

We note the issues raised are similar to those before the court in Delaware Riverkeeper Network, 833 F.3d 360. In that case, DEP decided to issue a Freshwater Wetlands Permit without conditions to protect two endangered bird species that might have been in the area. Id. at 381. The DEP based its decision on expert reports indicating there had only been "limited sightings of the species," that the affected wetlands area was relatively small, and that the birds' habitats had already been fragmented by "open areas and neighboring homes." Ibid. The Third Circuit affirmed, finding that DEP fully considered potential adverse impacts on endangered species. Ibid. DEP here went further to protect wildlife by imposing conditions on the Permits.

With respect to mitigation, FWPA and its rules provide that DEP must require as a condition to a Freshwater Wetlands Permit "that all appropriate measures have been carried out to mitigate adverse environmental impacts, restore vegetation, habitats, and land and water features, prevent sedimentation

and erosion, [and] minimize the area of freshwater wetland disturbance . . . ." N.J.S.A. 13:9B-13(a); N.J.A.C. 7:7A-11.2(b). To that end, an applicant must submit a mitigation proposal which must be approved prior to the commencement of any activities covered by a FWPA permit. N.J.A.C. 7:7A-11.2(b). Review of this proposal is "independent of" the decision whether the permit should be granted and may be completed before or after that decision is made. Ibid.

To achieve mitigation requirements, DEP may require an applicant to create, enhance, or restore "an area of freshwater wetlands of equal ecological value to those which will be lost," whether onsite or offsite. N.J.S.A. 13:9B-13(b). If it determines that onsite mitigation is not feasible, it may consider offsite action "or the making of a contribution to [a] Wetlands Mitigation Bank." N.J.S.A. 13:9B-13(c); N.J.A.C. 7:7A-11.2(o)(4); N.J.A.C. 7:7A-11.11(b)(1).

Such a bank is "an operation in which wetlands, uplands, and/or other aquatic resources are restored, created, enhanced, or preserved by a mitigation bank operator for the purpose of providing compensatory mitigation for disturbances to freshwater wetlands and/or State open waters." N.J.A.C. 7:7A-1.3. The applicant's contribution must be "equivalent to the lesser of the cost of: (1) purchasing, and enhancing or restoring, existing degraded freshwater

wetlands" that will result in "preservation of freshwater wetlands of equal ecological value to those . . . lost, or (2) purchasing property and the cost of creation of [new] freshwater wetlands of equal ecological value to those . . . lost." N.J.S.A. 13:9B-13(c).

Here, onsite creation of new areas of wetlands is likely not possible because of the particular characteristics of the project area. Indeed, the plot of land involved is largely populated by invasive phragmites, and the Loop will be constructed upon pre-existing railway embankments and a compacted dirt roadway that is mostly devoid of vegetation; the construction is thus limited to "actively disturbed areas" in compliance with FHACA. N.J.A.C. 7:13-11.2(b)(2). DRP also stated that it plans to replace any vegetation it does remove by reseeding the ground with native plants and inserting new native shrubs and trees. Thus, DRP's mitigation plan includes not only the purchase of credits, but onsite remediation activities as well. Thus, contrary to appellants' arguments, under these provisions, DRP's proposal to purchase mitigation bank credits to alleviate the Loop's environmental impact was permissible and appropriate.

Transition Areas

Under FWPA, a "transition area" is defined as "an area of land adjacent to a freshwater wetland which minimizes adverse impacts on the wetland or

serves as an integral component of the wetlands ecosystem." N.J.S.A. 13:9B-3.[7] FWPA categorizes freshwater wetlands into three types by their "resource value": 1) "exceptional" wetlands which discharge into certain types of waters or which are "present" or "documented habitats for threatened or endangered species which remain suitable for breeding, resting, or feeding by these species during the normal period these species would use the habitat"; 2) "ordinary" wetlands which do not exhibit these characteristics "and which are certain isolated wetlands, man-made drainage ditches, swales, or detention facilities"; and 3) "intermediate" wetlands which are all those not included in the other two categories. N.J.S.A. 13:9B-7(a) to (c).

The FWPA and FHACA rules define "documented habitat for threatened or endangered species" as areas for which "[t]here is recorded evidence of past use by a threatened or endangered species of flora or fauna for breeding, resting, or feeding." N.J.A.C. 7:7A-1.3; N.J.A.C. 7:13-1.2. Such evidence "may include, but is not limited to, sightings of the species, or of its sign (for example, skin, scat, shell, track, nest, herbarium records, etc.), as well as identification of its call." Ibid.

---

[7] N.J.A.C. 7:7A-1.3 includes a picture diagram of an example transition area. It is depicted as a band of land of a required width, all around the border of a freshwater wetland.

Thus, DEP need not restrict exceptional classification to "habitats in which an endangered or threatened species either has presently been sighted or has been sighted in the past." In re Adopted Amends. to N.J.A.C. 7:7A-2.4, 365 N.J. Super. 255, 266 (App. Div. 2003). However, if such evidence of past use is present, DEP must also make a "finding that the area remains suitable for use by the specific documented threatened or endangered species during the normal period(s) the species would use the habitat." N.J.A.C. 7:7A-1.3; N.J.A.C. 7:13-1.2. FWPA "affords DEP broad discretion to document such habitats." Adopted Amends., 365 N.J. Super. at 266. See, e.g., ZRB, LLC v. N.J. Dep't of Env't Prot., Land Use Regul., 403 N.J. Super. 531, 558-63 (App. Div. 2008) (deferring to DEP's designation of wetlands as exceptional quality based on nearby offsite observations of threatened barred owls including sightings and hearing calls, and current conditions of the project area being suitable for owl nesting and foraging).

A permit applicant may request that a documented habitat for endangered or threatened species not result in an exceptional classification if that applicant "can demonstrate the loss of one or more requirements of the specific documented threatened or endangered species, including, but not limited to

wetlands or overall habitat size, water quality, or vegetation density or diversity." N.J.S.A. 13:9B-7(a)(2).

Certain activities, including removing, excavating, or disturbing soil, erecting structures, dumping or filling with any materials, and destroying plant life "which would alter the existing pattern of vegetation" are prohibited in a transition area. N.J.S.A. 13:9B-17. Any person or entity wishing to engage in such activity within 150 feet of an exceptional quality wetland or within fifty feet of an intermediate quality wetland must obtain a waiver from DEP.[8] N.J.S.A. 13:9B-17(b); N.J.S.A. 13:9B-16. A waiver application must include a statement "detailing any potential adverse environmental effects of the activity on the freshwater wetlands and any measures that may be necessary to mitigate those effects." N.J.S.A. 13:9B-17(b)(3).

If a waiver is granted, the size of the transition area may be reduced to not less than seventy-five feet around an exceptional quality wetland and not less than twenty-five feet around an intermediate quality wetland. N.J.S.A. 13:9B-18(a); N.J.S.A. 13:9B-16(b). A waiver may only be granted for an exceptional quality wetland if the reduction of the transition area's size "would have no

---

[8] "A transition area is not required adjacent to a freshwater wetland of ordinary resource value or adjacent to a State open water." N.J.A.C. 7:7A-3.3(c).

A-1897-21

substantial adverse impact on the adjacent freshwater wetlands" or if denial of the waiver "would result in extraordinary hardship to the applicant because of circumstances peculiar to the subject property." N.J.S.A. 13:9B-18(c).

Here, DEP classified the 0.0169 acres of freshwater wetlands within the project area for the Loop as being of intermediate resource value. The Permits impose a buffer of fifty feet around these wetlands, noting that this is "the standard transition area" under N.J.S.A. 13:9B-17(b).

Based on our review of the record, we are satisfied the classification of the wetlands as intermediate instead of exceptional is amply supported. Although, as previously discussed, there have been documented observations of endangered species within one-fourth of a mile of the project area, there is no evidence that these species or their "signs" have been seen in the actual wetlands to be disturbed by the Loop.

In fact, Ramboll's reports contained information indicating that these wetlands would not "remain[] suitable for use by the specific documented threatened or endangered species" as required for an exceptional classification. N.J.A.C. 7:7A-1.3; N.J.A.C. 7:13-1.2. Instead, they stated that sturgeon cannot reach the project area and bald eagles and ospreys are not likely to nest or forage there because of the territorial breeding pair of eagles on a nearby island.

Ramboll also indicated that the vegetation in the area is largely common, invasive phragmites, and that the disturbance in the designated transition area will be confined to the existing roadway, which already constitutes an active disturbance in itself.

We therefore conclude DEP properly exercised its "broad discretion" to classify the affected wetlands as intermediate, Adopted Amends., 365 N.J. Super. at 266, and thus correctly imposed a fifty-foot transition area requirement upon DRP. N.J.S.A. 13:9B-17(b). Further, appellants' argument DRP was not entitled to a transition area waiver is simply irrelevant, as no such waiver was sought or needed.

In sum, DEP did not act arbitrarily, capriciously, or unreasonably when issuing the Permits, as DRP's application adequately addressed potential impacts to threatened and endangered species, and the Permits themselves impose appropriate conditions and mitigation requirements to offset and minimize any disturbance to habitats.

To the extent we have not addressed any arguments raised by appellants, it is because we have concluded these arguments lack sufficient merit to warrant discussion in this opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

59

A-1897-21